# United States Court of Appeals
## For the First Circuit

No. 14-1738

UNITED STATES OF AMERICA,

Appellee,

v.

NELSON VÉLEZ-LUCIANO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Barron and Stahl, Circuit Judges,
and Sorokin,* District Judge.

Mark W. Shea, with whom Shea and LaRocque, LLP was on brief, for appellant.

Susan Z. Jorgensen, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Francisco A. Besosa-Martínez, Assistant United States Attorney, were on brief, for appellee.

February 25, 2016

_____

* Of the District of Massachusetts, sitting by designation.

**SOROKIN**, **District Judge**. After pleading guilty to one count of possession of child pornography, appellant Nelson Vélez-Luciano ("Vélez-Luciano") received a sentence of ten years in prison followed by fifteen years of supervised release. The terms of his supervised release included multiple conditions, some of which he challenges in this appeal. Because Vélez-Luciano's plea agreement included an applicable waiver of appeal provision, a heightened standard of review applies. With one exception, Vélez-Luciano cannot satisfy this standard for the challenged conditions. We thus vacate that one condition, affirm the rest, and remand the case to the district court for resentencing, limited solely to the vacated condition.

## I. Background

### A. Facts

Because this appeal follows a conviction via guilty plea, we draw the facts from the plea colloquy and sentencing materials. United States v. Whitlow, 714 F.3d 41, 42 (1st Cir. 2013). In July 2007, Vélez-Luciano began working for Dorado, Puerto Rico as a Music Teacher and the Director of the Municipal Band. In early 2012, Nereida Jiménez, the mother of a seventeen-year-old female student of Vélez-Luciano referred to as "JRJ," complained to police that Vélez-Luciano had requested that JRJ send him nude photos of herself, and had sexually abused JRJ. Vélez-Luciano had been living with Jimenez and JRJ for

approximately seven months at that point, and on March 21, 2012, Jimenez obtained an Order of Protection and Eviction against Vélez-Luciano.

Law enforcement investigated the allegations and discovered that Vélez-Luciano began providing special treatment to JRJ at least as far back as January 2010, and began having sexual contact with her -- including intercourse -- in May 2010, when she was fifteen. Vélez-Luciano had sex with JRJ multiple times since, including during JRJ's lunch periods. Around this time, JRJ began, at Vélez-Luciano's request, taking photos of herself and sending them to him. JRJ estimated that she sent approximately sixty photos, ranging from partially nude to fully nude, to Vélez-Luciano. Investigators found three images of JRJ, all focused on her genitals, on Vélez-Luciano's computer. Additionally, Vélez-Luciano had sexually explicit conversations, via both text messaging and Facebook messaging, with JRJ. He also directed JRJ to view pornographic websites so that she could learn what Vélez-Luciano wanted to do with her, but the record indicates that she did not look at the web sites.

The investigation further revealed that Vélez-Luciano abused a second female, a fifteen-year-old referred to as "VMCH."[1]

---

[1] Veléz-Luciano objected to the inclusion -- as not sufficiently proven -- of facts about VMCH. At sentencing, Vélez-Luciano's counsel pressed this objection, which the district court

- 3 -

In 2008, when she was eleven, Vélez-Luciano recruited VMCH, who has a mental age three years behind her actual age, into the band. He began sexually abusing her in 2010, when she was fourteen. These encounters took place in the music band room. Additionally, Vélez-Luciano encouraged VMCH to view a pornographic website containing animated cartoons engaging in sexual conduct with each other, and she did so. Vélez-Luciano wanted VMCH to learn from the cartoons so that she would do with him what the cartoon characters did with each other. Finally, Vélez-Luciano engaged in a threesome with both VMCH and JRJ in the music band room, providing them each with baton twirler outfits and directing them on what to do, culminating in sexual relations.

B. Prior Proceedings

On April 25, 2012, a grand jury in the District of Puerto Rico indicted Vélez-Luciano on two counts of producing child pornography, in violation of 18 U.S.C. § 2251(a), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). On May 10, 2013, pursuant to an agreement with the government, he pled guilty to the possession count; the government subsequently dismissed the two production counts. The deal recommended a ten-year term of imprisonment, and contained no other agreements or recommendations regarding the sentence. It

---

overruled. On appeal, Vélez-Luciano has not challenged this ruling. Accordingly, we consider the facts pertaining to VMCH.

- 4 -

said nothing about the duration or conditions of Vélez-Luciano's supervised release, but did recite the statutory maximum period of supervised release. It also contained a waiver of appeal provision, which read: "The defendant hereby acknowledges that should the Court sentence him or her to the agreed-upon specific sentence, or agreed-upon sentencing range, the defendant agrees to waive and permanently surrender his or her right to appeal the judgment and sentence in this case."

At a change of plea hearing before a magistrate judge that same day, the magistrate judge reviewed the parameters of the agreement -- including the conduct alleged, the rights waived pursuant to the agreement, and the recommended sentence -- with Vélez-Luciano. The magistrate judge specifically informed Vélez-Luciano that he faced a term of at least five years of supervised release following his incarceration. At another part of the colloquy, the magistrate judge focused specifically on making sure that Vélez-Luciano understood the appellate waiver.[2] Upon

---

[2] THE COURT: The law provides a [sic] generally that defendants in a federal criminal case have the right to appeal any sentence the Court imposes.

Are you aware of that right?

VÉLEZ-LUCIANO: Yes.

THE COURT: But I want to point out to you that, in your plea agreement, at paragraph 18, you agree to waive your right to appeal both

- 5 -

completing the required change of plea colloquy, the magistrate judge found that Vélez-Luciano was competent to plead guilty, that Velez-Luciano was aware of the nature of the charged conduct and the impact of pleading guilty, and that the plea was knowing and voluntary. He issued a Report and Recommendation that the district court accept Vélez-Luciano's plea, and the district court did so on June 3, 2013.

On June 11, 2014, the Probation Office issued its Presentence Investigation Report ("PSR"). Among other content, the PSR recommended that the district court impose twenty-two special conditions of supervised release applicable to sex offenders. It did not provide any specific reasoning supporting these recommendations. Vélez-Luciano did not object to any of these conditions in his sentencing memorandum.

---

the judgment and the sentence in your case, provided the court accepts your plea agreement and sentences you according to its recommendations.

Are you aware of that right?

VÉLEZ-LUCIANO:     Yes.

THE COURT:     And do you voluntarily agree to waive your right to appeal both your conviction and your sentence if the Court so accepts your plea agreement?

VÉLEZ-LUCIANO:     Yes.

- 6 -

Vélez-Luciano's sentencing hearing occurred the next day. After handling preliminary matters, the district court imposed the ten-year term of imprisonment recommended by the plea agreement. The district court, without explanation, also sentenced Vélez-Luciano to fifteen years of supervised release, with several conditions attached. These conditions included both the thirteen standard conditions of supervised release and the special conditions of supervision that the PSR recommended. Vélez-Luciano did not object to any of these conditions at the sentencing hearing.

C.   This Appeal

Vélez-Luciano raises two general issues on appeal. First, he argues that the waiver of appeal provision in his plea agreement does not cover an appellate challenge to his supervised release conditions. Next, he challenges, broadly speaking, four categories of these conditions: sexual offender treatment; internet access; contact with minor children; and access to pornography. After oral argument, the government informed us via a Federal Rule of Appellate Procedure 28(j) letter ("Rule 28(j) letter") that it would not seek to impose a particular type of treatment, penile plethysmograph ("PPG") testing,[3] on Vélez-Luciano.

---

[3] "PPG testing involves placing a pressure-sensitive device around a man's penis, presenting him with an array of

Because the applicability of Vélez-Luciano's waiver of appeal provision impacts our analysis of the challenged conditions, we address that issue first. We then proceed seriatim through the challenged conditions.

## II. Scope of Vélez-Luciano's Waiver of Appeal

Vélez-Luciano argues that, because he agreed to waive only a challenge to his prison term -- and not to the conditions of his supervised release -- his waiver does not cover this appeal. He does not argue, nor could he, that the district court failed to comply with the waiver's condition precedent -- it handed down the same ten-year prison sentence the agreement recommended. Rather, he asserts that the conditions of supervised release stand apart from the "sentence" to which he agreed to waive his appellate rights.

This claim fails. We have repeatedly "ha[d] no trouble concluding that the word 'sentence' in [a plea agreement's] waiver encompasse[d] every component of the sentence, including the term of supervised release and its attendant conditions, thus bringing the instant action within the waiver's reach." United States v. Santiago, 769 F.3d 1, 7 (1st Cir. 2014); accord United States v. Del Valle-Cruz, 785 F.3d 48, 58 (1st Cir. 2015) ("We have

---

sexually stimulating images, and determining his level of sexual attraction by measuring minute changes in his erectile responses." United States v. Del Valle-Cruz, 785 F.3d 48, 53 n.4 (1st Cir. 2015) (internal quotation marks omitted).

- 8 -

frequently stated that conditions and terms of supervised release are part of a defendant's sentence."); United States v. Rojas, 780 F.3d 68, 69 (1st Cir. 2015) ("[B]ecause . . . [defendant's] appeal of the supervised release conditions is an appeal of the 'judgment and sentence' in his case, this appeal falls within the scope of the waiver.") (internal citation omitted); see United States v. Brown, 235 F.3d 2, 4 (1st Cir. 2000) ("A supervised release term is an integral part of a sentence, separate from and in addition to immurement."); see also 18 U.S.C. § 3583(a) ("The court . . . may include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment . . . .") (emphasis added). Per these holdings, this appeal falls within the scope of Vélez-Luciano's waiver.

### III. Enforceability of Vélez-Luciano's Waiver

Having determined that this appeal falls within the scope of Vélez-Luciano's waiver, we must next determine the waiver's enforceability. Santiago, 769 F.3d at 7. "The general rule is that when knowing and voluntary, an appellate waiver is generally enforceable, absent an indication that the waiver would work a miscarriage of justice." Id. (citing, inter alia, United States v. Teeter, 257 F.3d 14, 24-26 (1st Cir. 2001)). "To successfully invoke the miscarriage of justice exception, a garden-variety error will not suffice, rather there must be, at a bare minimum, an increment of error more glaring than routine

reversible error." Del Valle-Cruz, 785 F.3d at 54 (quoting Santiago, 769 F.3d at 8). The exception requires case-by-case analysis, but is applied stringently. See Teeter, 257 F.3d at 26. Finally, we note that, even absent an explanation for a sentence from the district court, we can often infer the reasoning from the record. United States v. Perazza-Mercado, 553 F.3d 65, 75 (1st Cir. 2009).

We first turn to whether Vélez-Luciano waived knowingly and voluntarily. Vélez-Luciano asserts that, because his agreed-upon sentence only mentioned a prison term and forfeiture, and not supervised release, he did not knowingly waive his right to appeal the supervised release conditions. Both the record and our past decisions undermine this argument.

In United States v. Ruiz, the Supreme Court instructed that "the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances—even though the defendant may not know the specific detailed consequences of invoking it." 536 U.S. 622, 629 (2002). And we have relied on Ruiz to hold as "inconsequential" a plea agreement's failure to enumerate the conditions of supervised release the defendant faced. United States v. Rodríguez-Santana, 554 F. App'x 23, 25 (1st Cir. 2014)(unpublished).

- 10 -

Vélez-Luciano's circumstances nestle into this space. Although not specifically part of the recommended sentence, the plea agreement -- which Vélez-Luciano signed and initialed -- noted that supervised release of at least five years was part of the maximum sentence for possession of child pornography. Further, the magistrate judge at Vélez-Luciano's change of plea hearing specifically informed him that "[s]upervised release is a term of supervision [he would] have to serve after [he was] released from prison," and Vélez-Luciano acknowledged understanding this. Vélez-Luciano's recognition of the prospect of supervised release, even without awareness of the specific conditions the district court intended to impose, suffices to make his waiver knowing and voluntary. Having established this element of the Teeter test, we now examine the individual categories of special conditions to determine if enforcement of any of them constitutes a miscarriage of justice.

A.    Internet Restrictions (Conditions 17, 18, and 23)[4]

---

[4] Condition 17 reads: "The defendant shall not have access to the Internet at his place of residence, unless approved by the U.S. Probation Officer." Condition 18 reads: "The defendant shall not possess or use a computer, cellular telephone, or any other device with internet accessing capability, at any time and/or place without prior approval from the probation officer. This includes access through an internet service provider, bulletin board service, e-mail system, or any public or private computer network system. The defendant shall permit routine inspections of his computer system or any other computer system maintained in his possession to include hard drive and any media storage materials, in order to confirm adherence to this condition. The inspection

We begin with Conditions 17, 18, and 23, which preclude Vélez-Luciano's internet access without a probation officer's prior approval. Because the internet played a role in Vélez-Luciano's offense conduct, he cannot demonstrate the requisite miscarriage of justice necessary to overcome his appellate waiver.

We have recognized the propriety of robust internet restrictions "where (1) the defendant used the internet in the underlying offense; (2) the defendant had a history of improperly using the internet to engage in illegal conduct; or (3) particular and identifiable characteristics of the defendant suggested that such a restriction was warranted." United States v. Stergios, 659 F.3d 127, 134-35 (1st Cir. 2011) (quoting Perazza-Mercado, 553 F.3d at 70).

Vélez-Luciano meets these criteria. The record shows that he: exchanged sexually explicit Facebook messages with JRJ and VMCH; suggested pornographic sites for them to view; convinced VMCH to actually view the pornographic site; groomed VMCH's behavior with the suggested website; and possessed sexually explicit pictures of JRJ on his computer. This is not the case of a defendant who "has no history of impermissible internet use" and

_____

shall be no more intrusive than is necessary to ensure compliance with third party risk, who may be impacted by this condition." Condition 23 reads: "If the defendant possesses a cellular telephone, the same shall be restricted to incoming/outgoing calls and voice messaging system [sic]. No additional features shall be allowed without prior approval from the probation officer."

- 12 -

for whom "the internet was not an instrumentality of the offense of conviction." Cf. Perazza-Mercado, 553 F.3d at 69 (vacating a categorical ban on home internet usage when the offense conduct, carried out wholly without use of the internet, involved sexually abusing a minor child in the defendant's care). Given these facts, Vélez-Luciano cannot demonstrate a miscarriage of justice in the district court's imposition of the internet restrictions.[5]

B. Pornography Ban (Condition 12)[6]

---

[5] We note that, as the internet becomes completely interwoven with the fabric of daily living -- including education, treatment, employment, and communication with both the government or commercial entities -- limitations on, or exclusion from access to, the internet may require greater justification and precision. Otherwise, such restrictions may undermine the rehabilitative purpose of sentencing, see 18 U.S.C. § 3553(a)(2)(D), and the district court's obligation to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes of" sentencing. Id. at § 3553(a). Nonetheless, in light of the applicable standard of review and the particular facts presented, we need not address these considerations here.

[6] Condition 12 reads: "The defendant shall not view, use, possess, purchase, distribute and/or subscribe to any form of pornography, erotica or sexually stimulating visual or auditory material, electronic media, computer programs or services including but not limited to videos, movies, pictures, magazines, literature, books, or other products depicting images of nude adults or minors in asexually [sic] explicit manner. The defendant shall not enter any location where pornography, erotica or sexually stimulating visual or auditory material can be accessed, obtained or viewed, including adult pornography shops, strip and/or topless clubs, massage parlors, or any business were [sic] the primary function is to provide pornography or sexual services. The defendant shall refrain from accessing any material that relates to the activity in which the defendant was engaged in committing the instant offense, namely child pornography."

We likewise affirm Condition 12, which effectively imposes a complete ban on pornography. Because both Vélez-Luciano and the government rely on Perazza-Mercado in crafting their arguments, we begin our analysis there. Perazza-Mercado presented the question of "whether a ban on pornographic material as a condition of supervised release for an individual convicted of sexual contact with a minor constitutes [plain] error when there is no evidence that possession of such material has any relationship to the offense of conviction and there is no evidence in the record that the [defendant] previously possessed such materials." 553 F.3d at 74 (emphasis added). We held that it did. Id. at 76. We particularly emphasized that lack of "suggestion in the PSR or at sentencing that [Perazza-Mercado] had abused or even possessed pornography in the past, much less that it contributed to his offense or would be likely to do so in the future." Id.[7]

That factual dynamic is not present here. The record reveals that Vélez-Luciano suggested that JRJ view pornography so

---

[7] In a pair of subsequent cases, we have expanded somewhat Perazza-Mercado's holding to situations where defendants have a history of possessing pornography. See United States v. Medina, 779 F.3d 55, 63-64 (1st Cir. 2015); United States v. Ramos, 763 F.3d 45, 64 n.28 (1st Cir. 2014). However, we have never expanded Perazza-Mercado so far as to strike down an unobjected-to ban on pornography as a condition of supervised release when the record revealed a link between the offense conduct and the defendant's viewing of pornography.

- 14 -

that she could perform the sexually explicit conduct Vélez-Luciano desired. Additionally, he encouraged VMCH to view a pornographic website of animated cartoons as a way of communicating to VMCH what he wanted to do with her and JRJ, and VMCH did so. Undoubtedly, Vélez-Luciano had seen these sites before recommending them to his victims. These facts indicate that Vélez-Luciano used pornography to further conduct related to his offense. Moreover, he also possessed sexually explicit photos of JRJ which she created at his direction. This shows that his possession of pornography was "reasonably related to the nature and circumstances of the offense and to [his] history and characteristics," which in turn demonstrates the condition's requisite "grounding in the present . . . record." United States v. Ramos, 763 F.3d 45, 64 (1st Cir. 2014).

Because pornography played a material role in Vélez-Luciano's conduct, the ban reasonably relates to the nature and circumstances of his offense.[8] The record supports this deprivation of liberty as a means of preventing Vélez-Luciano from using a key tool of his abuse. Accordingly, Vélez-Luciano has not

---

[8] We also note that the fact that Vélez-Luciano abused young girls from early adolescence until close to the age of majority, combined with the use of internet pornography to groom his victims, defeats any risk of overbreadth under the applicable standard of review.

demonstrated the requisite miscarriage of justice sufficient to

overcome his waiver.[9]

    C.    <u>Minor Children Restrictions (Conditions 6, 7, 8, 9, and 16)</u>[10]

Vélez-Luciano next challenges Conditions 6, 7, 8, 9, and

16, which effectively require prior approval from a probation

---

[9] Vélez-Luciano's brief raised an additional ground for invalidating Condition 12, that it "does not provide fair warning as to what constitutes pornography or erotica due to inherent ambiguity in those terms." This excerpt is the entirety of Vélez-Luciano's analysis on this point. As we have repeatedly admonished, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Ledesma-Sánchez v. Lynch, 797 F.3d 131, 134 (1st Cir. 2015) (quoting United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

[10] Condition 6 reads: "The defendant shall not participate in any volunteer activity or be involved in any children's or youth organization or any group that would bring him/her into close contact with a child or children under the age of 18, unless prior approval of the U.S. Probation Officer [sic]." Condition 7 reads: "The defendant shall not reside, be in the company, date or socialize with a child or children below the ages of 18, unless previously approved by the U.S. Probation Officer and after a third party risk [sic] has been duly signed." Condition 8 reads: "The defendant shall not enter, loiter or work within one hundred (100) feet of any area or event frequented by people under the age of 18 including, but not limited to: schools, day care centers, playgrounds, arcades, public swimming pools or beaches, unless approved in advance by the U.S. Probation Officer." Condition 9 reads: "The defendant shall have no personal contact with the victim and/or minors under the age of 18, through mail, letters, telephone, communication, audio or visual, computer, electronic devices, visits, social networking sites, or third parties, unless approved in advanced [sic] by the U.S. Probation Officer. The only exception in this condition relies in the incidental contact in normal commercial life with minors." Condition 16 reads: "The defendant shall not engage in a specified

officer before interacting with, or even going near, children under the age of eighteen. He claims these conditions are overbroad, without basis in the record, and unreasonably restrictive of his ability to earn a livelihood.

In his brief, Vélez-Luciano offered multiple arguments generally opposing the minor children restriction, and each of them are unavailing. First, he incorrectly argues that Conditions 6-9 are occupational restrictions, subject to the more-stringent U.S.S.G. § 5F1.5 standard.[11] These conditions, except for part of Condition 8, do not bar him from any particular occupation at all -- they simply pertain to his association with minors. Further, while Condition 16, and part of Condition 8, do limit his

occupation, business, or profession bearing a reasonable [sic] direct relationship to the conduct constituting the offense. Specifically, the defendant shall not work with children under the age of 18, or hold a job that gives him authority over potential victims, gives him access to vulnerable populations or places him in setting [sic] near a school or playground. Any employment must be approved in advance by the Probation Officer, who will make an assessment of the job placement and set employment restrictions based on the Sex Offender Management Procedures Manual. The defendant shall consent to third party disclosure any [sic] employer or potential employer."

[11] To impose such restrictions, a district court must find both: "(1) a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. § 5F1.5(a).

occupational options, the record supports the district court's imposition of these conditions. Vélez-Luciano met both JRJ and VMCH through his professional oversight of the band at school, and used this access to gain influence over and abuse them, including while at school. This meets the "reasonably direct relationship" prong of the occupational restriction test. And given the temporal proximity between Vélez-Luciano's sexual misconduct and sentencing, the "well-recognized high recidivism rate for sex offenders," Santiago, 769 F.3d at 9, and Vélez-Luciano's recklessness in abusing someone with whom he lived (JRJ), the record offers enough support for the "reasonabl[e] necess[ity] to protect the public" prong of U.S.S.G. § 5F1.5.

Next, Vélez-Luciano offers less-stringent conditions to show that the district court deprived him of more liberty than necessary. However, each of these proposed conditions fails to assure public safety. His first proposal, which would permit him to work with children but never be alone with fewer than ten, still allows him access to new potential victims. His second offering, that another adult be present when Vélez-Luciano is with a minor, similarly fails. Given that he both molested JRJ even while living with her and her mother, and abused her in the band classroom -- where other children would attend rehearsals and while other teachers were in the building -- the record plausibly supports the inference that, far from creating a miscarriage of justice, the

situation required stronger preventive measures than a simple requirement of another adult's presence when Vélez-Luciano interacted with children.

Finally, Vélez-Luciano argues that these conditions deprive him of his economic livelihood. This is plainly wrong. He can still work with bands that do not contain minor children as members and that perform at adult venues, such as nightclubs. He also can perform other jobs that require his musical skills without having to interact with children. Condition 16 makes clear that it does not limit what Vélez-Luciano can do, it simply limits with whom he can do it.

At oral argument, Vélez-Luciano raised for the first time the argument, which he expanded on in his Rule 28(j) letter, that these conditions infringe on his right to maintain a relationship with his minor children. Vélez-Luciano has nine children, three of whom were minors at the time of the PSR. Two of them, one daughter and one son, will still be minors once his term of incarceration ends. No record evidence suggests any misconduct against these children. By not raising this issue in his briefing, Vélez-Luciano has waived this argument as to both children. See United States v. Hogan, 722 F.3d 55, 61 (1st Cir. 2013). Nonetheless, because Vélez-Luciano's already-existing relationship with his minor children "implicate[s] a fundamental

- 19 -

constitutional liberty interest," Del Valle-Cruz, 785 F.3d at 56-57, we offer some observations.[12]

Even if Vélez-Luciano had briefed this issue, the miscarriage-of-justice standard would preclude relief as to his daughter. In Del Valle-Cruz, we held that imposing conditions "prohibiting [the defendant, who had minor children of his own,] from having personal contact with, and living with, any minor child" constituted a miscarriage of justice when applied to the defendant's own minor children. 785 F.3d at 52, 57-58. We relied heavily on the lack of a reasonable relationship between Del Valle-Cruz's failure to register offense and the ban on interaction with minor children. See 785 F.3d at 59-62. We specifically mentioned the absence of any record evidence that the presence of a child in the home posed a danger; that the district court imposed the condition eighteen years after the underlying sexual offense conviction; that he had committed no sexual or minor-based crimes during those eighteen years; that he had lived with his older children for several years without any incident, developing a relationship with them; and that the district court offered no explanation for why it imposed the minor children restrictions in that situation. Id.

---

[12] We also note that these substantial constitutional questions entitle Vélez-Luciano to careful and serious consideration from his Probation Officer for any requests for exceptions to these conditions he may make.

Although the record does indicate that Vélez-Luciano lived with some of his minor children for some time without incident, other facts paint a more troublesome picture, especially with regards to his daughter. For about seven months, he lived in the same house as one of his minor victims, JRJ. His conviction stemmed from sexual misconduct committed against her within three years of sentencing. And this was concurrent to sexual abuse he committed against a second minor victim, VMCH. Each of these facts presents an important distinction between Vélez-Luciano and Del Valle-Cruz; together, they undermine the latter's precedential potency and demonstrate how these conditions would not constitute a miscarriage of justice sufficient to overcome the waiver of appeal provision as applied to his daughter. Cf. Santiago, 769 F.3d at 9 (holding that imposing a condition barring contact with minors on a defendant with minor children who molested the daughter of his live-in then-girlfriend when the defendant currently lived with his girlfriend and her daughter did not constitute a miscarriage of justice).

While Vélez-Luciano's failure to brief this issue also precludes our review insofar as this argument applies to his minor son, we note that his son would present different considerations. The record reflects that Vélez-Luciano only poses a threat to young girls -- nothing suggests he has any predilection towards males. And the government itself acknowledged this in its Rule 28(j)

letter.    We highlight the substantial constitutional questions this application presents so that the Probation Officer does not operate on a blank legal canvas should Vélez-Luciano request, after his release from prison in 2021,[13] the Probation Officer to exercise the authority, delegated by the District Judge, to make exceptions from this condition.

D.    <u>Sex Offender Treatment Condition (Special Condition 3)</u>[14]

Finally we address Special Condition 3, which requires Vélez-Luciano to undergo a sex offender treatment program and to comply with any of that program's testing requirements, including PPG testing.    Vélez-Luciano focuses his appeal on the prospect of facing PPG testing.    In its Rule 28(j) letter, the government announced that it no longer desired to potentially subject Vélez-Luciano to PPG testing.    Noting that because "Vélez-Luciano's predilection seems to be for teenage females that have reached the age of full biological and physical maturity (14-17 years)," the government informed us that "the PPG testing would likely not have

---

[13] This is Vélez-Luciano's currently-scheduled release date, without any reduction or extension.

[14] The relevant part of Condition 3 reads: "The defendant shall undergo a sex-offense-specific evaluation and/or participate in a sex offender treatment/and or mental health treatment program arranged by the Probation Officer.    The defendant shall abide by all rules, requirements, and conditions of the sex offender treatment program(s), including submission to testing; such as polygraph, penile plethysmograph (PPG), Abel Assessments, visual reaction testing or any other testing available at the time of his release."

any usage in treatment." The government bases its position on the record we have before us.

We find that potentially subjecting Vélez-Luciano to PPG testing when the government expressly disavows the utility of this particular procedure about which we have expressed reservations, see United States v. Medina, 779 F.3d 55, 70-73 (1st Cir. 2015), especially when the record lacks any explanation of the applicability of PPG testing to this defendant, constitutes a miscarriage of justice. We thus decline to enforce Vélez-Luciano's waiver of appeal and address the condition's merits, as it applies to Vélez-Luciano's exposure to PPG testing.

Because Vélez-Luciano did not object to the PPG condition below, we review for plain error. United States v. MacArthur, 805 F.3d 385, 390 (1st Cir. 2015). Vélez-Luciano must "carry the burden of plain error review by showing: '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Oppenheimer-Torres, 806 F.3d 1, 4 (1st Cir. 2015) (quoting United States v. Marchena-Silvestre, 802 F.3d 196, 200 (1st Cir. 2015)).

Vélez-Luciano meets all four factors. It is clearly erroneous, when faced with no countervailing evidence or explanation, to impose a condition of supervised release that

subjects a defendant to a highly invasive procedure when both the government and the defendant think the procedure has no efficacy. Further, this error affected Vélez-Luciano's substantial rights by imposing on him that very condition -- if confronted with the government's disavowal of the PPG condition, the district court likely would not have included potential PPG testing as a condition of supervised release. Finally, this condition undermines the fairness, integrity, or public reputation of the district court's proceedings by potentially subjecting Vélez-Luciano to an intrusive, yet concededly ineffective, condition of supervised release without any explanation or, on this record, apparent purpose. We thus vacate Condition 3, insofar as it subjects Vélez-Luciano to potential PPG testing, and remand to the district court for consideration of whether to reimpose this Condition.

## IV. Conclusion

For the foregoing reasons, we **affirm** the district court in all respects except for Condition 3, solely insofar as it authorizes PPG testing. We thus remand the case to the district court for resentencing on that Condition. Should the district court reimpose the PPG testing provision, it must explain its reasoning for doing so.[15]

---

[15] Because we find that Vélez-Luciano's waiver of appeal bars us from reaching the merits of every Condition except Condition 3, and we find that Condition both a miscarriage of justice and plainly erroneous, this case does not compel us to

- 24 -

address what distinction, if any, exists between the miscarriage-of-justice and the plain-error standards.