In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 16-1384, -1385, -2248, -2249, -2330

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MINAS LITOS and ADRIAN and DANIELA TARTAREANU,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:12-cr-00175-PPS-APR—**Philip P. Simon**, *Judge.*

_____

ARGUED JANUARY 18, 2017—DECIDED FEBRUARY 10, 2017

_____

Before WOOD, *Chief Judge,* and POSNER and HAMILTON, *Circuit Judges.*

POSNER, *Circuit Judge.* The three defendants were indicted in 2012 on charges of having committed and conspired to commit wire fraud, in violation of 18 U.S.C. §§ 1343 & 1349, by extracting money from lenders (including Bank of America) that had financed the sale of properties owned by the defendants in Gary, Indiana. The fraud lay in the fact that the

defendants had represented to Bank of America (we can ignore the other lenders, who are not affected by this litigation) that the buyers of the properties were the source of the down payments on the houses, whereas in fact the defendants were the source, having given the buyers the money to enable them to make the down payments. They had also helped the buyers provide, in their loan applications to Bank of America, false claims of creditworthiness. In each of the transactions the defendants walked away with the purchase price of the property they had sold minus the down payment amount, since the "down payment" they received was their own cash, which they'd surreptitiously transferred to the impecunious buyer.

The defendants' guilt of fraud is not at issue. The issue is the propriety of the restitution, in the amount of $893,015, that the district judge ordered the defendants to make to Bank of America, on the ground that they had cheated the bank by pretending that the buyers, not they, were the source of the down-payment money for the sale of their houses. The judge credited a written declaration by a Bank of America representative that "had [the Bank] known the true source of [the] down payment funds, [it] would not have issued the subject loans" to the buyers of the properties. The district judge rejected the defendants' argument that the bank was not entitled to restitution because it had been a coconspirator; he ruled that the bank "did not participate in the kickbacks to buyers or provide false information on loan applications."

The judge was right about that, and right too that the bank had lost $893,015 as a result of the buyers' defaulting on the loans that the bank issued to finance the purchase of

sixteen houses from the defendants. But he was wrong to take the bank representative at her word; her affidavit provided no basis for determining that she knew that Bank of America wouldn't have made the loans had it not been for the defendants' fraudulent statements.

The order of restitution is questionable because Bank of America, though not a coconspirator of the defendants, does not have clean hands. It ignored clear signs that the loans that it was financing at the behest of the defendants were phony. Despite its bright-eyed beginning as an upstart neighborhood bank for Italian-American workers, Bank of America has a long history of blunders and shady practices; it narrowly survived the Great Depression of the 1930s, nosedived in the 1980s, and lost tens of billions of dollars in the crash of 2008—including $16.65 billion in a settlement with the U.S. Justice Department over charges of mortgage fraud. See, e.g., Michael Corkery and Ben Protess, "Bank of America Papers Show Conflict and Trickery in Mortgages," *New York Times*, Aug. 21, 2014, https://dealbook. nytimes.com/2014/08/21/bank-of-america-papers-show-confl ct-and-trickery-in-mortgages/ (visited Feb. 10, 2017, as were the other websites cited in this opinion); Matt Taibbi, "Bank of America: Too Crooked to Fail," *Rolling Stone*, March 14, 2012, www.rollingstone.com/politics/news/bank-of-america-too-crooked-to-fail-20120314; Moira Johnston, *Roller Coaster: The Bank of America and the Future of American Banking* 6–11 (1990); Gary Hector, *Breaking the Bank: The Decline of Bank America* 49–53, 302–07 (1988). And at the sentencing hearing the judge said: "I think they [the defendants and Bank of America] are equally culpable. Isn't that a fair way to look at this? … Bank of America knew [what] was going on. They're playing this dance and papering it. Everybody knows it is a

sham because no one is assuming any risk. So what's wrong with saying they're [of] equal culpability?" Indeed; and we are puzzled that after saying this the judge awarded Bank of America restitution—and in the exact amount that the government had sought.

And there is worse. The judge remarked that "the loan applications [submitted to Bank of America] were a joke on their face. They are just, I think, laughable." The bank had issued 9 mortgages to a person named Julius Horton in a 3-month period, based on his false claims to have $1 million in assets and earn $10,000 a month; 8 mortgages to Glenn McCue in a 2½ month period, who listed as assets homes he didn't own and rental income on those homes; 6 mortgages in a 10-day period [!] to Melissa Hurtado, who claimed to have a gross income of $3400 a month and $320,000 in a banking account—she had no such money, nor had she the two properties that she claimed to own; 3 mortgages to Jonathan Sein, who listed ownership of homes that he didn't own and a nonexistent $150,000 bank account; and 2 mortgages to Alberto Gonzalez, who listed a home he didn't own and pretended to have a bank account with $350,000 in it, though his monthly income was estimated to be only between $1000 and $2000. Bank of America approved them all! The transactions with all these mortgage applicants took place in 2007 and the first few months of 2008, 2007 being the last full year of the housing bubble and 2008 the first year of the crash.

Had the bank done *any* investigating at all, rather than accept at face value obviously questionable claims that the mortgagors were solvent, it would have discovered that none of them could make the required down payments, let alone pay back the mortgages. These people were just fronts

for the defendants, who made the down payments required by the bank, pocketed the mortgage loans (which were of course much larger than the down payments) that the bank made, and left it to the nominal mortgagors to default since they hadn't the resources to repay the bank. All this was *transparent*.

To say the bank was merely negligent would be wrong. Recklessness is closer to the mark. Negligence is merely failure to exercise due care; often it is unconscious. Recklessness is knowing involvement in potentially harmful activity. The bank was reckless. It had to know that it would receive applications for mortgage loans from people who knowing or doubting their ability ever to repay them would misrepresent their assets and earning power in order to obtain the loans, their thinking taking the form of "sufficient unto the day is the evil thereof," a biblical maxim (meaning "live in the present") that is better applied to spiritual life than to investment decisions. And the bank knew that in a bubble period it would have no difficulty selling the mortgages it had issued—even mortgages doomed to default; the bank's failure to demand evidence of the financial sufficiency of the mortgagees constituted deliberate indifference to a palpable risk that the bank's executives must have been aware of. The bank had every incentive to close its eyes to how phony these loan applications were, because it expected to turn around and sell the mortgages to a hapless Fannie Mae. (It was foiled in this scheme, regarding the sixteen properties at issue, only because Fannie Mae noticed just how "irregular" the transactions were and forced Bank of America to take the mortgages back.)

Restitution for a reckless bank? A dubious remedy indeed—which is not to say that the defendants should be allowed to retain the $893,015. That is stolen money. We don't understand why the district judge, given his skepticism concerning the entitlement of Bank of America to an award for its facilitating a massive fraud, did not levy on the defendants a fine of $893,015. 18 U.S.C. § 3571(d) authorizes a fine of not more than the greater of twice the gross gain or the gross loss caused by an offense from which any person either derives pecuniary gain or suffers pecuniary loss.

Had the amount of the fraud been made the basis of a fine rather than restitution, the $893,015 would have gone to the federal Treasury, a far worthier recipient of it than Bank of America in this case. At least that is an issue that deserves the further scrutiny of the district court, and we are therefore vacating the order of restitution and remanding for a full resentencing as to the Tartareanus (more as to Litos later). Because a criminal sentence is a package composed of several parts, "when one part of the package is disturbed, we prefer to give the district court the opportunity to reconsider the sentence as a whole so as to 'effectuate its sentencing intent.'" *United States v. Mobley*, 833 F.3d 797, 801 (7th Cir. 2016). Our remand for the imposition of a new sentence for the Tartareanus will allow the district court to "reconfigure the sentencing plan" to "satisfy the sentencing factors in 18 U.S.C. § 3553(a)." *Pepper v. United States*, 562 U.S. 476, 507 (2011), quoting *Greenlaw v. United States*, 554 U.S. 237, 253 (2008).

We ask the district judge to give serious consideration on the remand to the possible alternative remedy of a heavy fine on the defendants. With regard to such a possibility the

judge may wish to ask either the Board of Governors of the Federal Reserve System or the Office of the Comptroller of the Currency (or both, perhaps in collaboration) to submit an amicus curiae brief addressed to the issue of the appropriateness of an order of restitution in a case such as this.

We are mindful that the federal criminal code requires "mandatory restitution to victims of certain crimes," 18 U.S.C. § 3663A (the Mandatory Victim Restitution Act of 1996, usually referred to as the MVRA), including fraud, see § 3663A(c)(1)(A)(ii), but only for "an offense resulting in damage to or loss or destruction of property of a victim of the offense." § 3663A(b)(1). That doesn't seem to describe the loss suffered by Bank of America as a result of its improvident loans, especially when we consider its complicity in the loss—its reckless decision to make the loans without verifying the solvency of the would-be borrowers, despite the palpable risk involved in, for example, providing mortgage loans to a person who applies for six mortgages in ten days.

We need to consider, however, the possible bearing on the issue of restitution in this case of *United States v. Soto*, 799 F.3d 68 (1st Cir. 2015), a case in which one of the defendants challenged a restitution order on the ground that "because the losses stemmed not only from her conduct but also from the lenders' own greed and market practices at the time, her actions did not proximately cause the entire loss." *Id.* at 97. The court of appeals rejected the argument on the ground that the fact "that the lenders' own greed and market practices at the time may have contributed to the loss has nothing to do with whether the entire loss amount was foreseeable to [the defendant]." *Id.* at 98. But the defendant in *Soto* had argued that the lenders were "greedy," not that they

had engaged in wrongdoing but only that the general "market practices" at the time had influenced their behavior. This case is different because of the palpably phony nature of the loan applications and the fact that Bank of America approved all of them without investigation of the manifold suspicious circumstances—such conduct of a major bank is indicative of deliberate indifference rather than of mere negligence. That difference also distinguishes this case from *United States v. Ojeikere*, 545 F.3d 220, 223 (2d Cir. 2008), which held that "restitution under the MVRA may not be denied simply because the victim had greedy or dishonest motives, where those intentions were not *in pari materia* with those of the defendant." The court reasoned that the victims had not been involved in a scheme to lose their own money. Here, in contrast, Bank of America was deliberately indifferent to the risk of losing its own money, because it intended to sell the mortgages and transfer the risk of loss to Fannie Mae for a profit.

It remains to consider defendant Litos's appellate waiver. He pleaded guilty and in his guilty plea agreement he "agree[d] to make restitution to the victims of my offense in an amount to be determined by the sentencing court" and waived his right to appeal or otherwise contest his conviction or sentence. Yet like the Tartareanus, who were convicted by a jury, Litos appealed—despite his waiver—thus presenting us with a dilemma. If we enforce his appellate waiver, Litos will be left on the hook for the full $893,015 in restitution to Bank of America, because the district judge's order made the three defendants jointly and severally liable. But if we vacate the restitution portion of all three sentences, we must ignore Litos's appellate waiver. Because our doubts about the propriety of ordering restitution to Bank of Ameri-

ca apply as much to Litos as to the other defendants, however, and because it would be unjust to make Litos alone owe the full amount of restitution to the undeserving bank, we've decided to ignore the appellate waiver.

A number of the other federal courts of appeals have said they won't enforce even voluntary and knowing waivers in plea agreements if enforcing them would result in a "miscarriage of justice." See, e.g., *United States v. Vélez-Luciano*, 814 F.3d 553 (1st Cir. 2016); *United States v. Adams*, 814 F.3d 178, 182 (4th Cir. 2016); *United States v. Hahn*, 359 F.3d 1315, 1327 (10th Cir. 2004); *United States v. Andis*, 333 F.3d 886, 891 (8th Cir. 2003); *United States v. Khattak*, 273 F.3d 557, 562 (3d Cir. 2001); *United States v. Teeter*, 257 F.3d 14, 25–26 (1st Cir. 2001). In *Vélez-Luciano*, for example, the First Circuit refused to enforce an appeal waiver with respect to a condition of supervised release because the government had indicated that it no longer thought the defendant ought to be subject to the condition and the court had expressed its own reservations about the utility of the condition. 844 F.3d at 564–65. And in this case too the government and the district judge both expressed reservations about the propriety of awarding restitution to Bank of America.

Further with reference to Litos's appeal waiver, we've held that there are exceptional situations in which waiver does not foreclose appellate review—for example if an appeal waiver is part of a plea agreement that was involuntary, or if the district court relied on a constitutionally impermissible factor, or if the defendant received ineffective assistance of counsel in regard to the negotiation of a plea agreement, or if the sentence exceeded the statutory maximum. *Jones v. United States*, 167 F.3d 1142, 1144 (7th Cir. 1999). And,

coming closer to the facts of this case, in *United States v. Andis*, *supra*, 333 F.3d at 892, the Eighth Circuit said it would not enforce an appellate waiver if "the sentence is 'in excess of a statutory provision *or otherwise contrary to the applicable statute*'" (emphasis added). Likewise, Bank of America was not a proper victim for the purposes of restitution under 18 U.S.C. § 3663A, and so the order of restitution was contrary to the applicable statute and therefore illegal—just as a prison term that exceeded a statutory maximum would be illegal.

We therefore decline to enforce Litos's appellate waiver as to restitution, but, because the exceptions to waiver are narrow, uphold it as to the rest of his sentence. So while we reverse the order of restitution against Litos as well, we remand only for limited resentencing on the issue of restitution (with direction to consider whether a fine is possible).

In all other respects the judgment of the district court is affirmed.