In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 17-2759 and 17-2761

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ADRIAN TARTAREANU and DANIELA
TARTAREANU,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:12-cr-00175 — **Philip P. Simon**, *Judge.*

ARGUED FEBRUARY 7, 2018 — DECIDED MARCH 8, 2018

Before BAUER, ROVNER, and SYKES, *Circuit Judges*.

BAUER, *Circuit Judge.* On October 23, 2013, a jury convicted
Adrian and Daniela Tartareanu of wire fraud in violation of 18
U.S.C. § 1343 and conspiracy to commit wire fraud in violation
of 18 U.S.C. § 1349. They appealed their original sentences, and
we remanded for resentencing. *United States v. Litos*, 847 F.3d

906 (7th Cir. 2017). On remand, the district court sentenced Adrian to 36 months' imprisonment, Daniela to 21 months' imprisonment, and imposed a $30,000 fine on each of them. In this appeal, the Tartareanus challenge the district court's intended loss calculation under U.S.S.G. § 2B1.1, as well as its decision to deny Daniela a minor role reduction under U.S.S.G. § 3B1.2. We affirm.

## I. BACKGROUND

In 2005, Adrian and co-defendant Minas Litos established a company called Red Brick Investment Properties, through which they intended to purchase, rehabilitate, and resell homes. Daniela, the only employee with a real estate license, served as Red Brick's office manager. The group sought out buyers who either did not have good enough credit or enough money for a down payment (or both) and assisted them in applying for mortgage loans. Between June 2007 and March 2009, Red Brick sold 45 houses.

Red Brick provided the buyers with the down payment funds for each sale, but the loan applications falsely stated that the buyers were putting up their own money. Litos and the Tartareanus also assisted the buyers in providing false information on the applications indicating their creditworthiness for the loans, including fictitious incomes, nonexistent bank accounts, and other fake assets. The Tartareanus attended the closings as the seller's representatives and signed documents falsely stating that no portion of the down payments had been paid by the seller or any other third party.

After closing, Red Brick provided the buyers with further undisclosed payments, which were intended to ensure that the

buyers could make at least two payments before defaulting on their loans. Red Brick told the buyers that the properties had renters either present or incoming, though most buyers ultimately received insufficient rental income to cover their loan payments.

Bank of America provided the loans for 32 of the 45 Red Brick sales, all of which were processed by loan officer Stephanie Riggs. In March 2008, Bank of America opened an internal investigation into Riggs' loan files. During the investigation she acknowledged that it was possible that the loan applications contained false income and assets, but denied falsifying any of that information herself. Bank of America determined there was no conclusive evidence that Riggs had been involved in any dishonest act, but it fired her in April 2009, citing a loss of trust and confidence.

After a four day trial, a jury found the Tartareanus guilty of 16 counts of wire fraud and one count of conspiracy to commit wire fraud. The district court originally sentenced Daniela to 21 months' imprisonment, Adrian to 36 months' imprisonment, and ordered $893,015 in restitution to be paid jointly and severally to Bank of America. On appeal, we remanded for resentencing, holding that Bank of America was not a proper victim for purposes of a restitution order because it was deliberately indifferent to the many warning signs regarding the borrowers' inability to repay their loans. *Litos*, 847 F.3d at 908.

On remand, the United States Probation Office filed a revised Presentence Investigation Report (PSR). It recommended a total loss amount of $1,835,861, which was the same

as its original recommendation. The Tartareanus objected in their sentencing memoranda, arguing that the court should exclude Bank of America's losses from that calculation because it was not a "victim" that suffered an actual loss. The government contended that Bank of America's losses qualified as an "intended loss" under U.S.S.G. § 2B1.1, and, therefore, were properly included in the loss calculation.

The Tartareanus also cited a number of factors they contended should mitigate their sentences, pursuant to 18 U.S.C. § 3553(a). They noted the lack of threats and violence, that their fraud involved willing buyers and a complicit bank, their lack of criminal history, and Adrian's conduct while imprisoned to that point. They also submitted affidavits and other documents, which they argued demonstrated their belief that they were operating within the bounds of the law. Additionally, Daniela requested a base offense-level reduction, arguing that she was a minor participant under U.S.S.G. § 3B1.2.

At their resentencing hearings, the district court rejected the Tartareanus' objections to the loss amount calculation. It found that this was a case of intended loss, and that whether Bank of America was complicit in the scheme or not was irrelevant to the calculation. It determined, therefore, that the total loss amount was between $1.5 million and $3.5 million, corresponding to a 16-level enhancement.

The court also rejected Daniela's request for a minor role reduction finding that she was "the key office person who made the whole scheme, sort of, work." It found that all the

participants played important roles and that none was more minor than any other.

When considering the § 3553(a) factors, the court first incorporated all of its findings and considerations from the original sentencing hearings. The court noted Adrian's progress in prison and commended him for it, but stated that after reviewing the new filings and the entire case, nothing had materially changed from the time of the original sentences. The court sentenced Daniela to 21 months' imprisonment and Adrian to 36 months' imprisonment, both of which were below the applicable Guidelines ranges. Before concluding the two hearings, the court asked if it had addressed all of their principal arguments in mitigation; both Adrian and Daniela responded, through counsel, that it had. They timely appealed their sentences.

## II. DISCUSSION

The Tartareanus raise three arguments on appeal. First, they argue that the district court erred in its loss calculation by including the amount of the Bank of America loans. Second, Daniela argues that the court erred by denying her request for a minor role reduction. Finally, they both contend that the court failed to adequately address their principal arguments in mitigation. We address each in turn.

### A. Loss Calculation

The Tartareanus first take issue with the district court's inclusion of Bank of America's losses within the meaning of "intended loss" under U.S.S.G. § 2B1.1. We review *de novo* a district court's interpretation of the meaning of "loss" and the

methodology used in measuring that loss. *United States v. Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013).

U.S.S.G. § 2B1.1 provides for enhancements to a base offense level dependent upon the amount of "loss" an offense involved. § 2B1.1(b)(1). The Application Notes explain that "loss is the greater of actual loss or intended loss." § 2B1.1 cmt. n.3(A). The Notes define "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict," including any harm "that would have been impossible or unlikely to occur." § 2B1.1 cmt. n.3(A)(ii). The district court determined that the Tartareanus' intended loss was between $1.5 million and $3.5 million, which led to a 16-level increase in their base offense level. § 2B1.1(b)(1)(I). It included in that calculation the amount of the Bank of America loans involved in the scheme, which totaled approximately $1.3 million.

The Tartareanus argue that Bank of America's losses cannot be included in an intended loss calculation under § 2B1.1 because the bank was not a "victim" in this case due to its complicity in the scheme. As support, they rely heavily on *United States v. Vitek Supply Corp.*, 144 F.3d 476 (7th Cir. 1998), which, in their view, stands for the proposition that an intended loss calculation requires an identifiable victim; their reliance is misplaced, as that case focused on the *actual* losses suffered by a company, its consumers, and its competitors. *See id.* at 488–92. It did not contain an analysis, or even a discussion, of intended loss and certainly did not hold that a court must identify a "victim" for purposes of intended loss.

It is true, as we explained in our first opinion in this case, that Bank of America did not have clean hands in this scheme

and applying the label of "victim" seems inappropriate. *See Litos*, 847 F.3d at 908–09. We have recently made clear, however, that such a characterization is not relevant to the intended loss calculation. "Our cases have explained that intended loss is the amount that the defendant placed at risk," and neither the text of the Guidelines nor the relevant case law requires the government or the court to identify who, or what entity, was at risk. *United States v. Betts-Gaston*, 860 F.3d 525, 539 (7th Cir. 2017) (internal quotation marks and citations omitted).

An intended loss calculation simply requires a determination of the amount of money the defendants intended to place at risk. *See id.*; U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). In *Betts-Gaston*, the "scheme induced lenders to make mortgage-backed loans that were much riskier than their lenders realized because the borrowers were not as creditworthy as reported." 860 F.3d at 539. Because the defendant intended to place those loan amounts at risk, we held that the lenders' questionable conduct was not material to the analysis. *Id*. Here, the Tartareanus intended to place Bank of America's money at risk when they falsified information regarding down payments on the loan documents. Therefore, the court was correct to include the Bank of America loan amounts in the intended loss calculation, regardless of the bank's level of culpability.

## B. Minor Role Reduction

Next, Daniela argues that the district court erred when it denied her request for an offense-level reduction based on her role in the scheme. The denial of a minor role reduction requires a finding of fact and, therefore, we review that decision for clear error. *United States v. Orlando*, 819 F.3d 1016,

1024 (7th Cir. 2016). "Clear error exists when, after reviewing the evidence, we are left with a definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Panaigua-Verdugo*, 537 F.3d 722, 724 (7th Cir. 2008)).

Pursuant to U.S.S.G. § 3B1.2(b), a district court may reduce a defendant's offense level by two if it finds that "the defendant was a minor participant in the criminal activity." The Application Notes explain that the reductions available under this section are "for a defendant who plays a part in committing the offense that makes him substantially less culpable." *Id.* cmt. n.3(A). More specifically, a "minor participant" is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* cmt. n.5.

Here, the district court denied Daniela a minor role reduction because it found that, while Litos and the Tartareanus each had discrete and different roles, all three of them were necessary to the functioning of the scheme. It noted that Daniela issued most of the kickback and down payment checks to purchasers, attended closings where she signed settlement documents, assisted in convincing buyers that renters were available, and used her real estate license to find comparable homes that were used to boost the appraisal values of the homes Red Brick sold. The court also cited to the testimony of an employee of the title company, who stated that Daniela was the "point person" in the Red Brick office to whom she spoke if she needed to get something done.

Daniela argues that Litos and Adrian were substantially more culpable than she was because they had the only owner-

ship stakes in Red Brick, they were primarily involved in recruiting buyers, and Litos had "executive authority and veto power concerning every decision." There is no denying that Litos and Adrian were essential to the initiation of the scheme and its continuing operation. However, the district court found that Daniela's participation was just as important, and based on the facts it set forth, we cannot say that finding was clearly erroneous. Because all three were necessary components of the scheme, Daniela is not entitled to a minor role reduction. *See United States v. Kerr*, 13 F.3d 203, 206 (7th Cir. 1993) ("If everyone has an equal role, no one's offense level can be diminished … .").

## C. Principal Arguments in Mitigation

"A district court is required at sentencing to address the defendant's principal arguments in mitigation unless those arguments are without factual foundation or are too weak to require discussion." *United States v. Rosales*, 813 F.3d 634, 637 (7th Cir. 2016) (citing *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). The Tartareanus contend that the court failed to consider a number of affidavits and other documents they attached to their sentencing memorandum, which they argue demonstrated their belief that they had been operating within the bounds of the law.

This argument is waived. Before concluding both sentencing hearings, the court directly asked defense counsel whether it had adequately addressed all of Adrian's and Daniela's arguments in mitigation. In both instances, defense counsel responded, "Yes, judge." We have advised district courts to ask precisely that question in order to avoid this sort of

procedural error, and we have explained that "[i]f counsel replies in the affirmative, a contention on appeal that the district court failed to address a principal argument in mitigation would be deemed waived." *Id.* at 638 (citing *United States v. Garcia-Segura*, 717 F.3d 566, 569 (7th Cir. 2013)).

Contrary to the Tartareanus' contention, this is not a situation like the one present in *United States v. Morris*, where the court imposed its sentence and then simply asked, "Anything further in this matter?" 775 F.3d 882, 885 (7th Cir. 2015). There was no waiver there because the question "did not alert Morris's counsel that she needed to do something further to preserve her sentencing arguments, as we envisioned in *Garcia-Segura*." *Id.* at 886. Here, the court did exactly what *Garcia-Segura* instructed it do, and by answering in the affirmative, the Tartareanus waived their argument.

### III.  CONCLUSION

For the foregoing reasons, the district court's sentences are AFFIRMED.