In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4432

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID H. SWANSON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:01CR00083—**Sarah Evans Barker**, *Judge*.

ARGUED MAY 8, 2006[Œ]—DECIDED APRIL 20, 2007

Before BAUER, RIPPLE, and ROVNER, Circuit Judges.

ROVNER, *Circuit Judge.* For the second time David Swanson, who worked as an independent consultant and briefly as the chief executive officer of Countrymark Cooperative, Inc., appeals his prison sentence and the restitution and forfeiture orders entered on his convictions arising from a fraudulent scheme to siphon funds for his personal use from his consulting clients and Countrymark. We remanded previously, instructing the

---

[Œ] Pursuant to Operating Procedure 6(b), this successive appeal has been submitted to the same panel that decided Case No. 03-1863.

district court to reconsider the amounts it ordered as restitution and forfeiture, and for recalcuation of the guidelines imprisonment range using the 1998 version of the guidelines, which the parties agreed should apply. We also recognized that aspects of Swanson's sentence under the guidelines might be affected by the then-forthcoming decision in *United States v. Booker*, 543 U.S. 220 (2005). Now in this second appeal, Swanson renews his disagreements with the district court's calculation of the fraud loss and the amount of restitution, and he also presses a new contention that in formulating his guidelines sentence the court erroneously applied an upward adjustment for his role as an organizer or leader of extensive criminal activity. We are not persuaded by these arguments—or by others that rest on views about *Booker* that we have rejected in other cases—and accordingly affirm the judgment of the district court.

## I.

We presume familiarity with our prior opinion, *United States v. Swanson*, 394 F.3d 520 (7th Cir. 2005) ("*Swanson I*"). Briefly, as an independent consultant and as the CEO of Countrymark, Swanson managed the acquisitions of related agricultural enterprises. He used his positions for personal gain, however, by obtaining "reimbursement" for phony expenses and by inflating the reported purchase price of one acquisition and keeping the extra money for himself. After a three-week trial, a jury found Swanson guilty of wire fraud, money laundering, interstate transportation of stolen funds, and income tax evasion. At the first sentencing, the district court found that Swanson's fraud led to $6.7 million in losses; that conclusion was based in part on what the court characterized as "the government's proof at trial that the jury accepted." The court also entered orders of restitution and forfeiture

but failed to consider whether the restitution figure should have been offset by money repaid to the victim corporations and by the value, if any, they received from Swanson's work on the acquisitions. The court also neglected to ensure that the forfeiture figure encompassed only proceeds from Swanson's illegal activities.

Because of these errors, we remanded for resentencing. We noted that the jury returned general verdicts and thus did not make any findings relevant to the fraud loss; accordingly, we instructed the district court to revisit the loss determination and, if necessary depending on the outcome in *Booker*, other guidelines findings as well. *See Swanson I*, 394 F.3d at 526 n.1. We also directed the district court to reconsider the amounts of restitution and forfeiture after making additional factual findings, and to recalculate the imprisonment range using the 1998 guidelines rather than the 2001 version that the court employed. *Id.* at 530.

At resentencing the parties and the district court all agreed that Swanson should be sentenced using the 1998 version of the guidelines. The government, however, argued that our remand in Swanson's first appeal did not require the district court to recalculate the fraud loss for purposes of the guidelines. In a memorandum supported by an extensive compilation of trial exhibits, the government offered revised calculations for the amounts of restitution and forfeiture. For his part, Swanson argued that our remand did require a recalculation of the fraud loss, and that the government failed to support its revised calculation with adequate evidence. He also objected that he had acted alone and thus a four-level upward adjustment under U.S.S.G. § 3B1.1 for organizing and leading the criminal activity should not be reimposed. This was not an argument he made at the first sentencing hearing or that he raised in his prior appeal. Swanson further objected to the government's proposed

restitution figure. He argued that the requested amount still failed to account for the value that his work, even if fraudulent in part, may have conferred on the victims, but he refused to suggest an alternative figure for restitution or produce any evidence that part of what he did for his victims was legitimate.

The district court recalculated the fraud loss using the government's new itemization but still arrived at $6.7 million, just as before. The court used this figure in applying U.S.S.G. § 2F1.1, the applicable offense guideline from the 1998 version of the guidelines, and once again added four levels under § 3B1.1(a). The court then sentenced Swanson to 151 months of imprisonment, the high end of the resulting range of 121 to 151 months. In addition, with no proposed restitution figure from Swanson, the court adopted the government's calculations, which credited Swanson for repayments made to Countrymark, and ordered Swanson to pay $2.2 million in restitution.

## II.

### A.  Fraud Loss Amount

Swanson first argues that the district court erred in calculating a $6.7 million fraud loss. The court's calculation subjected Swanson to a 14-level upward adjustment under the 1998 version of the guidelines. *See* U.S.S.G. § 2F1.1(b)(1)(O), (P) (1998) (increasing offense level by 14 if loss caused by fraud totals more than $5 million but less than $10 million). The two largest components of the loss stem from Swanson's conduct during Countrymark's acquisition of Malta Clayton, an agriculture feed company, and his role in promoting a start-up company called GreenHeat, LLC. He says the loss figure is overstated since it includes (1) amounts that even now he characterizes as "closing costs" for the Malta Clayton

acquisition, (2) investments in GreenHeat that Swanson says were lost because the company failed and not because of his fraud, and (3) losses stemming from conduct not charged in his indictment.

As to the acquisition, Swanson told Countrymark's board of directors that acquiring Malta Clayton would cost $33 million. In fact, as Swanson knew, the actual cost was only $31 million, but he collected a total of $35 million for the deal from Countrymark and another investor. Swanson left the $4 million surplus in a bank account that he alone controlled, and from that account he diverted half to his personal use before he was discovered. At trial the chairman of Countrymark's board confirmed that Swanson misrepresented the acquisition cost to be $33 million. The government also introduced phony invoices that Swanson created to convince Countrymark that nearly all of the $2 million he used for personal expenses and funneled to his private accounts had gone to Vickers and Allen, Inc., a consulting firm, for "closing costs" associated with the acquisition. Swanson did not disclose to the board that he controlled this firm, and its two named principals testified that they were unaware of any work performed in connection with the Malta Clayton acquisition.

After Countrymark discovered it had been bilked and forced Swanson to resign, he began promoting a start-up company called GreenHeat, LLC, which purportedly was developing an environmentally friendly fuel derived from soybeans. Swanson amassed a sizable amount of capital for the venture, including a $1.13 million investment by Archer Daniels Midland Company ("ADM"). But instead of using this money to develop GreenHeat, Swanson used it to pay for personal expenditures and to make several installment payments to Countrymark under the terms of a settlement agreement the company reached with Swanson. Ultimately, ADM and the other investors lost

all of the money they contributed to GreenHeat. At trial an ADM representative testified that he reviewed some of GreenHeat's financial information provided by Swanson shortly before writing off the investment and could detect no misstatements. But at Swanson's first sentencing hearing, an agent from the Internal Revenue Service ("IRS") testified that she had reviewed GreenHeat's bank and tax records and concluded that the start-up was never viable and that Swanson converted the company's funds to his personal use.

All of this was adequately established, and at resentencing the district court found that the "amount put at risk" by Swanson included the entire $4 million he diverted during the Malta Clayton acquisition. The court likewise included ADM's investment in GreenHeat. Although the GreenHeat swindle was not alleged in the indictment, the court noted that loss for guidelines purposes encompasses other acts that are part of a "common scheme or course of conduct." And, the court reasoned, Swanson's theft of ADM's $1.13 million investment in GreenHeat was just another step in his scheme of "obtaining funds through mergers, acquisitions and joint ventures."

Swanson first challenges the district court's loss finding because, he asserts, some of the extra $4 million he took for the Malta Clayton acquisition might really have been used for legitimate closing costs. To support this position, Swanson points to trial testimony by an Ernst & Young accountant (and government witness) who stated during cross-examination that the fees charged by Vickers and Allen for the Malta Clayton acquisition fell within the range calculated under a standard formula used to determine broker's fees.

A district court need only make a reasonable estimate of the loss flowing from a fraudulent scheme, *see* U.S.S.G.

§ 2B1.1 cmt. n.3(C); *United States v. Vivit*, 214 F.3d 908, 915 (7th Cir. 2000), and we will not disturb the court's loss calculation—a factual finding—unless it is clearly erroneous, *United States v. Berheide*, 421 F.3d 538, 540 (7th Cir. 2005). Loss cannot include the value of services a defendant legitimately performed for the victims of his fraud, *Vivit*, 214 F.3d at 915, but it does include the "amount that the defendant placed at risk by misappropriating money or other property," *United States v. Lauer*, 148 F.3d 766, 768 (7th Cir. 1998) (counting all money placed in Ponzi scheme as intended loss, even though portion was recovered, because entire amount was placed at risk); *see also Swanson I*, 394 F.3d at 527.

The district court did not commit clear error. The court properly concluded that Swanson put the surplus funds for the Malta Clayton acquisition at risk. He obtained control over the $4 million by intentionally overstating the acquisition cost of Malta Clayton, and once he had the money he placed it in a bank account over which he maintained sole control. Swanson then created false invoices to cover the diversion of $2 million from that account, and the remaining $2 million was at risk of a similar fate. Moreover, defense counsel's unsupported assertion that Swanson might have legitimately spent some of the $4 million on closing costs is frivolous. *See Swanson I*, 394 F.3d at 527 ("[A] defendant's wholly unsubstantiated statements are not enough to counter or even question the court's acceptance of the government's proof of loss as outlined in the presentence investigation report."); *Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002) (stating that counsel's representations are not evidence); *United States v. Krankel*, 164 F.3d 1046, 1054-55 (7th Cir. 1998) (holding that "bald, unsupported assertions" by defendant cannot refute presentence investigation report). The Ernst & Young accountant's testimony is irrelevant. The purported

closing costs might have been reasonable had Vickers and Allen actually performed work on the acquisition, but the principals of that firm denied doing any such work, and they would know. There is no mystery about what Swanson did with the funds he diverted; he sent a sizable amount to a lawyer in Switzerland and moved the rest to his personal bank account.

Swanson also contests the inclusion in the fraud loss of ADM's $1.13 million investment in GreenHeat. Swanson still insists that GreenHeat was a legitimate venture that simply failed; he points to the testimony of the ADM representative who reviewed the financial information Swanson provided and found nothing suspect. But that is the point: Swanson was the source of the information, and it was false. That is why the IRS agent, after studying tax and bank records, concluded that Swanson once again siphoned company funds for personal use, and that GreenHeat was never viable.

Swanson also argues that the district court should have excluded the GreenHeat swindle from the fraud loss because it was not charged in the indictment. But relevant conduct not charged in the indictment is always fair game at sentencing. The court was required to include the GreenHeat losses if they were "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2); *see United States v. Firth*, 461 F.3d 914, 917-18 (7th Cir. 2006). An offense is part of a "common scheme or plan" if it is "substantially connected" to the offense of conviction "by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3 cmt. n.9(A); *see United States v. Delatorre*, 406 F.3d 863, 867 (7th Cir. 2005). Here, the court found that the common scheme was defined by a similar modus operandi: "obtaining funds through mergers, acquisitions and joint ventures." Swanson specialized

in misusing his positions to convert to his own use funds invested in the agricultural businesses he was promoting. He followed this scheme in procuring ADM's investment in GreenHeat, just as he did in promoting Countrymark's acquisition of Malta Clayton. The district court's inclusion of this fraud as relevant conduct is not clearly erroneous.

Under the 1998 guidelines used by the district court at resentencing, Swanson's imprisonment range is sustainable with a fraud loss of between $5 and $10 million, *see* U.S.S.G. § 2F1.1(b)(1)(O), (P) (1998), and the losses to Countrymark ($4 million) and ADM ($1.13 million) are enough to put Swanson within this range.

## B.  Aggravating Role Adjustment

Swanson also argues that, because he allegedly acted alone, the district court clearly erred when it increased his guidelines offense level by four based on his role as an "organizer or leader of criminal activity that . . . was otherwise extensive." U.S.S.G. § 3B1.1(a). But as we have previously held, "any issue that could have been but was not raised on appeal is waived and thus not remanded." *United States v. Husband*, 312 F.3d 247, 250-51 (7th Cir. 2002); *see also United States v. Morris*, 259 F.3d 894, 898 (7th Cir. 2001).

In sentencing Swanson the first time, the district court applied this upward adjustment, but Swanson did not challenge its application during his first appeal. In *Swanson I* we mentioned this adjustment in a footnote, explaining that at resentencing the district court might need to reconsider its application depending on the outcome of *Booker*. 394 F.3d at 526 n.1. We were concerned that the Supreme Court might decide that adjustments such as this must be determined by a jury

rather than the sentencing court, *see id.*, but that contingency did not come to pass. *See Booker*, 543 U.S. at 245-46; *United States v. White*, 472 F.3d 458, 464 (7th Cir. 2006); *United States v. Owens*, 441 F.3d 486, 490 (7th Cir. 2006). Consequently, the district court did not have to revisit its decision to impose the aggravating role adjustment in Swanson's case—any factual dispute as to its application was beyond the scope of our remand. In an abundance of caution the district court entertained and rejected defense counsel's contention that this adjustment is inapplicable because Swanson purportedly acted alone, but we will not similarly indulge Swanson's argument on appeal. Swanson "cannot use the accident of a remand to raise in a second appeal an issue that he could just as well have raised in the first appeal." *United States v. Parker*, 101 F.3d 527, 528 (7th Cir. 1996). Swanson waived this issue by failing to raise it during his first appeal.

## C.  Restitution

In this appeal, Swanson again argues that in calculating restitution the government failed to meet its burden of sorting out the financial benefit his victims purportedly received from his fraudulent activities. In *Swanson I*, we explained that, as part of its burden to prove a restitution amount, the government must deduct any value that a defendant's fraudulent scheme imparted to the victims. 394 F.3d at 527-28. Accordingly, at resentencing the government recalculated the restitution amount and submitted a supporting memorandum that cites extensively to trial testimony and to a compilation of trial exhibits. This time around the government's restitution figure excluded Swanson's repayments to Countrymark and losses arising from any uncharged relevant conduct. The government largely based its restitution figure on

Swanson's conduct in Countrymark's acquisition of Malta Clayton and its earlier acquisition of another company, Buckeye Feed Mills.

The government's memorandum directed the district court to evidence that Swanson took $2 million of $4 million he diverted during the acquisition of Malta Clayton. The memorandum also pointed to the following evidence about Countrymark's acquisition of Buckeye. Selig Ziess, a venture capitalist, testified at trial that he loaned Swanson $284,000 during Swanson's failed effort to buy Buckeye before he was hired by Countrymark as its CEO. Swanson promised that he would return the money at the closing of Buckeye's sale and, in fact, did so. At trial the government introduced an invoice submitted on behalf of Swanson to Buckeye for $284,000 payable to Associated Capital, a firm run by Ziess. The itemized invoice represents that payment was required for various services, including an industry review performed by Vickers and Allen. Both Ziess and representatives of Vickers and Allen testified that they knew nothing about the Buckeye closing or the fees listed in the Associated Capital invoice. Swanson requested an additional $247,392 in reimbursements from Buckeye related to the closing, and this itemized request was also introduced at trial. The CFO of Buckeye testified that many of the listed expenses were duplicative or for work that was not performed. Many of the people Swanson claimed to have paid for services related to the closing testified that they had performed no work on the acquisition.

Swanson did not propose an alternative restitution figure, but argued that the government failed to meet its burden of sorting out the benefit received from his fraudulent activities from the losses. Given the evidentiary support provided by the government, the district court found that these amounts were "sufficiently authoritative" and adopted the government's recommendation, ordering

Swanson to pay Countrymark $1.662 million and Buckeye $531,392 in restitution.

Here, Swanson essentially refashions his argument regarding the fraud loss figure and contends that some of the restitution awarded to Countrymark for losses associated with the Malta Clayton and Buckeye acquisitions were actually legitimate closing costs. And like his argument regarding the court's fraud-loss calculation, this argument is doomed. Restitution is subject to a preponderance standard, and we review the court's calculation for abuse of discretion. *See United States v. Danford*, 435 F.3d 682, 689 (7th Cir. 2005). The evidence shows that the requested reimbursements were not for actual services related to the closing of the business transactions, but that they were false requests for work that was never performed.

## D. Constitutional Issues

The remaining issues, raised by Swanson only to preserve Supreme Court review, are without merit. First, Swanson argues that the application of the remedial holding of *Booker*, which renders the guidelines advisory, violates the limitations on *ex post facto* judicial decisionmaking inherent in the idea of due process. We have previously rejected this argument, noting that *Booker* affected neither what conduct was considered criminal nor the statutory maximum penalties, and we do so again here. *See United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005). Lastly, Swanson argues that he was entitled to a jury finding beyond a reasonable doubt regarding his forfeiture and restitution amounts. But because restitution is a civil remedy, rather than a criminal punishment, it may be determined by a judge using a preponderance of the evidence standard and remains unaffected by *Booker*. *See United States v. LaGrou*, 466 F.3d 585, 593 (7th Cir.

2006); *Danford*, 435 F.3d at 689; *United States v. George*, 403 F.3d 470, 473 (7th Cir. 2005). Similarly, the Sixth Amendment and *Booker* do not apply to forfeiture orders because there is no statutorily prescribed maximum amount of forfeiture. *Swanson I*, 394 F.3d at 526; *United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005).

## III.

Accordingly, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*