In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3534

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRY L. SPIRK,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Western Division.
No. 05 CR 50054—**Philip G. Reinhard**, *Judge.*

ARGUED AUGUST 8, 2007—DECIDED SEPTEMBER 26, 2007

Before EASTERBROOK, *Chief Judge*, and COFFEY and
MANION, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Terry Spirk's career in
the insurance business culminated in 1991 with his
ownership of Lancaster Annuities Service Corporation.
After LASCO had operated profitably for several years,
Spirk decided to diversify and founded American Senior
Alliance, Inc. (ASA), to provide discounted health and
travel programs for members. Recruiting members proved
more difficult than expected, however, and by 1996 ASA
could not stay in operation without financial assistance
from LASCO, its sister corporation in a holding-company

structure that Spirk created. (The capstone was American Benefits Group.)

Spirk decided to raise operating funds for ASA by selling convertible notes in its profitable sibling LASCO. He assured investors that the investments were safe because he had guaranteed them and pledged his life insurance policy as additional security. He did not register these notes with state or federal securities regulators, however, and in 1998 the Illinois Securities Department told Spirk that he must either register the notes or stop selling them. Spirk signed a consent order promising to comply. But he went on selling the notes without registration and without providing investors with information that an issuer of securities must supply. When investors asked about regulatory approval, Spirk told them that the Illinois Securities Department had authorized the notes' sale; he instructed his staff at LASCO to tell investors the same thing.

By late 1998 LASCO was having trouble making interest payments on the notes and could not redeem notes presented for repayment of principal. Spirk tried to solve this problem by selling notes even faster, using the money from new investors to pay off the old, or at least to pay interest and keep them happy. Spirk regularly assured potential investors that LASCO was booming and their investments safe, though he knew that these representations were untrue. Late in 2000 the Illinois Securities Department issued an order banning Spirk from selling securities whether or not he registered them; this did not stop him from peddling yet more LASCO notes. But using new money to pay old investors, with interest, can't last unless the number of new investors increases exponentially. In LASCO's case the end came early in 2001, when both LASCO and Spirk entered bankruptcy. Investors lost more than $3 million. Unlike most operators of Ponzi schemes, Spirk did not live the high life while the

money rolled in; he plowed the cash into LASCO and ASA, even reducing his salary so that he could pay the staff's wages. This is cold comfort to the investors, however, many of whom lost their retirement savings.

Spirk violated not only state securities laws but also §5 of the Securities Act of 1933, 15 U.S.C. §77e, which provides that no securities may be sold in or by means of interstate commerce unless a registration statement is in effect or some exemption applies. Notes are among the many kinds of securities covered by this rule. 15 U.S.C. §77b(a)(1). Although intra-state sales are exempted by §3(a)(11), 15 U.S.C. §77c(a)(11), the exemption is lost if even a single security is offered or sold to a person outside the issuer's state of incorporation. It seems unlikely that Spirk never tried to induce anyone domiciled outside of Illinois to buy the notes. And other exemptions, such as the non-public offering exemption of §4(2), 15 U.S.C. §77d(2), are unavailable to persons who promote the stock widely and fail to comply with the SEC's Regulation D. See *SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953). Had he been indicted for violating §5, Spirk would have had no option but to plead guilty.

The indictment, when it came in 2005, did not mention the Securities Act. Instead it contained fifteen counts of fraud—eleven of mail fraud, 18 U.S.C. §1341, one of wire fraud, 18 U.S.C. §1343, and three of transporting in interstate commerce checks obtained by fraud, 18 U.S.C. §2314. Section 5 of the Securities Act does not require proof of fraud: sale of unregistered securities is a crime no matter how candid the issuer. The fraud charges did not avoid the need to show interstate commerce; all three fraud statutes, like §5 of the Securities Act, have commerce elements. Nor did charging 15 counts change the applicable penalty: Whether charged as a securities crime or as fraud, Spirk's acts fall within U.S.S.G. §2B1.1, and the number of counts is rendered irrelevant by

U.S.S.G. §3D1.2, which treats as one group all convictions arising from the same sort of conduct committed as part of a single scheme or plan. (The number of counts does matter if the guideline range exceeds the statutory maximum for a single count. Spirk's sentence of 108 months is less than the maximum for a single conviction under §2314 but would have required two unregistered-securities counts, as each has a maximum penalty of five years. 15 U.S.C. §77x.)

By charging a vanilla securities offense as a 15-count fraud offense, the indictment greatly complicated matters. The prosecutor called to the stand a parade of investors, who testified about what Spirk told them and how much they had lost. The prosecutor called Spirk's employees at LASCO and had them testify about how funds were raised and disbursed. Doubtless the prosecutor sought to engage the jurors' sympathy for the put-upon investors and depict Spirk as an inveterate liar—that's what the Assistant United States Attorney told us at oral argument—but the price was a long trial where no trial should have been necessary. And the prosecutor handed Spirk an opportunity to make a rejoinder that he would not have had to a securities-law charge. For although Spirk conceded every fact needed to convict him of violating §5, he vigorously denied that he had *defrauded* anyone. Some of his representations were true, Spirk insisted, and others were puffery rather than misrepresentations of fact. What's more, Spirk maintained, he intended to pay everyone eventually; that's why he guaranteed the notes, putting his own assets behind LASCO's promises. The prosecutor responded with proof suggesting that Spirk did not really plan to repay—that he did not reaffirm the guarantee following his bankruptcy, that he allowed his life insurance to lapse, that he has not paid investors any portion of his post-bankruptcy earnings, and so on.

Spirk's main argument on appeal is that his fervent belief in LASCO's long-run prospects, and his desire to repay, entitle him to a judgment of acquittal. The district judge allowed Spirk to present this argument to the jury (and allowed the prosecutor to respond at length) but should have put the whole subject off limits. The to and fro is irrelevant.

The crime of fraud means intentional falsehoods that are material (i.e., likely to be significant to a reasonable person deciding what to do). See, e.g., *Neder v. United States*, 527 U.S. 1 (1999). Someone who obtains a loan from a bank by representing that his income is $1 million a year, when actually he earns only $100,000 annually, has committed fraud even though he sincerely believes that he can repay. The lie exposes the bank to a materially greater risk of nonpayment than the lender knew it was accepting, and the creation of this risk by deceit is a crime even if the borrower plans to repay—indeed, even if the borrower actually repays. See, e.g., *United States v. Hamilton*, No. 06-1249 (7th Cir. Aug 29, 2007); *United States v. Masquelier*, 210 F.3d 756, 759 (7th Cir. 2001); *United States v. Dunn*, 961 F.2d 648, 651 (7th Cir. 1992).

The law requires people to tell the truth, so that their trading partners may decide for themselves which investments to make and which goods to buy or sell. People who want to raise money cannot obtain it by deceit and then try to persuade a jury that their intentions were good; a license to lie with a "good heart" would expose people to far too much risk and deny them the option of making intelligent and autonomous choices on their own behalf. Some people willingly accept risk, but they want to be compensated; by overstating LASCO's business prospects, Spirk secured high-risk investments at low-risk rates, so investors would have been losers even if LASCO had paid as promised. And many of the investors from whom

Spirk raised money would not have made high-risk investments no matter the promised rate of return.

The prosecutor's decision to pursue fifteen fraud charges created other complications. Instead of having to show that Spirk used the means or instrumentalities of interstate commerce once, the prosecutor assumed the burden of showing fifteen uses. Spirk contends that for one count, at least, the prosecutor conspicuously failed. Why Spirk should care is beyond us: 14 convictions are the same as 15 for sentencing purposes. But the $100-per-count-of-conviction special assessment (which as far as we can see has not been and never will be paid) means that we cannot invoke the concurrent-sentence doctrine. See *Ray v. United States*, 481 U.S. 736 (1987).

Perhaps the Criminal Justice Act, 18 U.S.C. §3006A, should be amended to provide that the public fisc will not reimburse more than $100 for an appeal to contest a concurrent sentence, and then only if the special assessment has been satisfied. Solvent defendants would not spend more than $100 to save $100, and the sixth amendment does not entitle insolvent defendants to more legal assistance than a wealthy defendant would buy in the market. But, as things stand, Spirk has enjoyed (at public expense) the assistance of one of the nation's top law firms to make this pointless argument, which the appellate briefs have debated with vigor. The prosecutor's brief runs 49 pages. So we must soldier on.

William V. Schubert testified that he invested $250,000 in LASCO's notes. The money came via two checks, one for $200,000 that Schubert hand-delivered to Spirk or LASCO's accountant, and the other for $50,000 carried to LASCO's offices by an employee of Schubert's insurance agent. The notes were handed over in exchange for the checks. Spirk's marketing efforts to Schubert were oral. For taking Schubert's money Spirk was convicted (in

Count 8) of mail fraud, but where's the mailing? The prosecutor's theory is that Spirk caused LASCO's accountant to mail Schubert a letter, dated two days after LASCO received the second check, describing Schubert's rights under the note and attaching a photocopy of its first page. That the mailing follows the fraud does not (necessarily) foreclose a conviction for mail fraud. Compare *Schmuck v. United States*, 489 U.S. 705 (1989), with *United States v. Maze*, 414 U.S. 395 (1974). Still, it was essential to prove beyond a reasonable doubt that the letter was *mailed* rather than hand-delivered, as the checks and notes had been, and on this the evidence is equivocal.

The record contains the letter but not its envelope. LASCO's files do not show whether it was mailed, sent by courier, or handed over when Spirk or the accountant next saw Schubert in person. Schubert testified that he "received" the letter but did not say how. This ensued:

> PROSECUTOR: And how would that have gotten to you? You didn't go in to [LASCO's office in] Naperville and pick it up, correct?
>
> SCHUBERT: No.
>
> PROSECUTOR: So, how would you have received it then?
>
> SCHUBERT: Mail, probably.

Schubert was not a hostile witness; why was the prosecutor asking leading questions? But even with leading questions all he could get was "[m]ail, probably." Schubert implied here, and made clear in response to other questions, that by the time of trial he could not remember receiving the letter. "Mail, probably" was just a guess—and not necessarily a good guess, given his history of dealing with Spirk face-to-face. The prosecutor did not establish that *any* mail, in either direction, passed between

Schubert and Spirk. A guess is not proof beyond a reasonable doubt.

Spirk's conviction on Count 8 is reversed. The convictions on the other counts, and the sentences corresponding to those counts, are affirmed.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—9-26-07