In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 16-2034

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AVALON BETTS-GASTON,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CR 502-1 — **Charles R. Norgle**, *Judge.*

---

ARGUED FEBRUARY 15, 2017 — DECIDED JUNE 20, 2017

---

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Defendant Avalon Betts-Gaston was convicted at trial on two counts of wire fraud. In this appeal, she raises numerous challenges to both her convictions and sentence. We affirm the convictions and sentence.

I.  *Factual and Procedural Background*

Betts-Gaston challenges the sufficiency of the evidence, so we recount the facts in the light most favorable to the government. *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009), citing *United States v. Richardson*, 208 F.3d 626, 631 (7th Cir. 2000).

Avalon Betts-Gaston and co-defendant Dimona Ross together formed a company that operated a scheme to defraud homeowners and mortgage lenders. Betts-Gaston and Ross found homeowners facing foreclosure and convinced them to participate in what the defendants said was a program to help them keep their homes. Betts-Gaston had the homeowners sign documents that deeded their homes to a trust the defendants controlled. Ross then arranged for straw buyers to obtain mortgages to buy the homes. Working with Betts-Gaston, she filled out loan applications that inflated the buyers' incomes and misrepresented the purpose of the purchases. Once a sale was completed, the buyer deeded the property back to the defendants' trust. When the dust on these transactions settled, the defendants had both the mortgage proceeds and title to the properties. The homeowners initially still lived in the homes but no longer had title to them or equity in them. At least two homeowners were eventually evicted.

At trial the government offered evidence of three such transactions, which we refer to according to the streets where the homes were located: the Ravengate property, the Trumbull property, and the Howard property. Ross's mother was the straw buyer for the Ravengate and Howard properties; Betts-Gaston's father played that role for the Trumbull property.

Betts-Gaston and Ross were indicted for this scheme in 2011. Count I described the scheme, identified the Trumbull and Howard transactions as part of the scheme, and charged both defendants with wire fraud in connection with wiring the mortgage funds for the Trumbull transaction. Count II charged the defendants with wire fraud in connection with wiring mortgage funds for the Howard property.

Ross pled guilty and agreed to cooperate with the government. Betts-Gaston proceeded to a jury trial at which the government presented evidence of the Howard, Ravengate, and Trumbull transactions. She was convicted on both counts. A fourth transaction, called the Hermosa transaction, was introduced at sentencing. Betts-Gaston was ultimately sentenced to a fifty-seven month term in prison.

## II. *Challenges to the Convictions*

Betts-Gaston challenges her convictions on five grounds: (A) the government concealed the terms of its plea agreement with her co-defendant, in violation of its *Brady* obligations; (B) the district court's limited questioning of prospective jurors violated her right to an impartial jury; (C) evidence on the materiality of her misrepresentations was excluded, impairing her right to present a defense; (D) insufficient evidence supported her conviction on Count II; and (E) the district judge was hostile to her in front of the jury, impairing her right to a fair trial.

### A. *Compliance with Brady*

*Brady v. Maryland*, 373 U.S. 83 (1963), "requires the government to disclose evidence materially favorable to the accused," including "evidence that tends to impeach a government witness." *United States v. Salem*, 578 F.3d 682, 685 (7th

Cir. 2009) (citations omitted). Such impeachment evidence often includes plea agreements between cooperating witnesses and the government. *Giglio v. United States*, 405 U.S. 150, 155 (1972) ("[E]vidence of any understanding or agreement as to a future prosecution would be relevant to [a witness's] credibility … .").

In this case, the government had a written plea agreement with Dimona Ross, who testified against Betts-Gaston. It gave that agreement to defense counsel, and Ross testified to its terms at trial. The plea agreement indicated that, pursuant to 18 U.S.C. § 3561, Ross could not be sentenced to a term of probation. It also left Ross free to argue for any sentence. At Ross's sentencing hearing, held ten months after Betts-Gaston's trial, her counsel asked for a sentence of probation. At that time, Ross had been on pretrial release for about five years, had been compliant with conditions, was caring for her elderly parents and her daughter, and was about to take a good job out of the state. In the court's view, Ross was "well on the path to rehabilitation." The court sentenced her to two years of probation.

Betts-Gaston believes the government agreed to secretly change the probation-eligibility term of the plea agreement, violating *Brady*. No evidence supports this theory. Moreover, the government's claim about Ross's probation eligibility did not describe a term of their agreement that could be modified. It was simply a description of the relevant law, complete with citation. The government might have misunderstood or misstated the law, but could not have suppressed it, as required for a *Brady* violation. Cf. *United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (no *Brady* violation in failing to disclose

publicly available information). There was no *Brady* error here.[1]

B. *Voir Dire*

Trial judges have "substantial discretion regarding the manner in which" they conduct voir dire, the questioning of prospective jurors. *United States v. Harris*, 542 F.2d 1283, 1295 (7th Cir. 1976). This appellate court does not interfere "unless there has been a clear abuse of that discretion," but defendants "must be permitted sufficient inquiry into the background and attitudes of prospective jurors to enable them to exercise intelligently their peremptory challenges." *Id.* Voir dire must be conducted to provide "a reasonable assurance that prejudice would be discovered if present." *United States v. Dellinger*, 472 F.2d 340, 367 (7th Cir. 1972). That standard will often require "go[ing] beyond asking the venirepersons only a few … 'stock questions.'" *Art Press, Ltd. v. Western Printing Machinery Co.*, 791 F.2d 616, 619 (7th Cir. 1986), quoting *Fietzer v. Ford Motor Co.*, 622 F.2d 281, 285 (7th Cir. 1980).

The district judge questioned the prospective jurors after soliciting proposed questions from both parties. The court

---

[1] It is not clear to us that the plea agreement was in error. The agreement cited 18 U.S.C. § 3561, which explains that a defendant "may be sentenced to a term of probation" except under certain circumstances, including that the offense is a class A or B felony. § 3561(a)(1). Class B felonies are those punishable by a maximum prison term of at least twenty-five years. 18 U.S.C. § 3559(a)(2). Ross pled guilty to one count of wire fraud affecting a financial institution, a violation of 18 U.S.C. § 1343 punishable by "not more than 30 years" in prison, and a Class B felony. See *United States v. DeRosier*, 501 F.3d 888, 899 n.21 (8th Cir. 2007). We are therefore not sure how Ross came to be sentenced to a term of probation, but that question is not before us.

briefly explained the nature of the case and the burden of proof, then questioned the jurors individually. The questions generally explored the jurors' backgrounds: their jobs, families, hobbies, and experience with the legal system. The court also asked whether the jurors had experience with property ownership or as crime victims, whether they knew anyone in the federal government, and generally whether they could be fair to the parties.

Betts-Gaston contends that the inquiries were insufficient for two reasons. First, she says the court should have asked all potential jurors about the burden of proof and presumption of innocence. While that may usually be the better course, we have held that district judges are not required to ask potential jurors about the burden of proof and presumption of innocence. See *United States v. Sababu*, 891 F.2d 1308, 1324 (7th Cir. 1989) (holding that "the district court's refusal to question potential jurors during *voir dire* on the issues of burden of proof and the presumption of innocence" did not "deprive[ defendants] of a fair trial").

Second, Betts-Gaston argues the trial judge "permitted no inquiry designed to elicit … attitudes toward the general nature or particular facts of the case." *Art Press*, 791 F.2d at 619; see also *United States v. Hastings*, 739 F.2d 1269, 1273 (7th Cir. 1984) ("This court will not find that a trial court abused its discretion in conducting voir dire where there is 'sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right of challenge.'"), quoting *United States v. Martin*, 507 F.2d 428, 432 (7th Cir. 1974). That criticism overstates the situation. The district court asked

about jurors' experiences as crime victims and property owners and their attitudes toward federal government employees—all questions that bore on Betts-Gaston's specific situation.

Betts-Gaston asked the court to cover two topics it did not ask about: jurors' experience with "'Foreclosure Rescue' businesses" and their attitudes toward lawyers. There is "no generally accepted formula for determining the appropriate breadth and depth of the voir dire, except that the court's discretion is 'subject to the essential demands of fairness.'" *Dellinger*, 472 F.2d at 367, quoting *Aldridge v. United States*, 283 U.S. 308, 310 (1931). Refusal to ask questions may be an error if they concern "matters where the likelihood of prejudice is so great that not to inquire would risk failure in assembling an impartial jury." *Dellinger*, 472 F.2d at 368 (reversing convictions of Chicago Seven where district court refused to question about attitudes toward Vietnam War and anti-war protest movement, toward "the so-called youth culture—hippies, yippies, and freaks," and toward law enforcement); see also *United States v. Robinson*, 475 F.2d 376, 381 (D.C. Cir. 1973) ("[T]here is … need for a searching voir dire examination[] [on] matters concerning which either the local community or the population at large is commonly known to harbor strong feelings that … significantly skew deliberations.").

In addition to the examples from *Dellinger*, we have applied that rule to, for example: attitudes toward media and advocacy groups "employing the anticipated chief witnesses, where the testimony stemmed from work done … on behalf of those organizations," *United States v. Lewin*, 467 F.2d 1132, 1138 (7th Cir. 1972), and racial prejudice in the trial of a black defendant, *United States v. Robinson*, 466 F.2d 780, 782 (7th Cir.

1972). Lawyers and foreclosure rescue do not incite comparable passions. We think the district court "could safely assume, without inquiry, that the veniremen had no serious prejudice on this subject, or could recognize such prejudices and lay them aside." *Dellinger*, 472 F.2d at 368. The district court did not abuse its discretion in conducting voir dire.

C. *Evidence of Materiality*

To show a violation of the wire fraud statute, 18 U.S.C. § 1343, the government had to prove that Betts-Gaston's scheme to defraud employed material falsehoods or omissions. *Neder v. United States*, 527 U.S. 1, 25 (1999); *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). A falsehood is material if it has a natural tendency to influence, or is capable of influencing, the decision of the person(s) to whom it is addressed. *United States v. Gee*, 226 F.3d 885, 891 (7th Cir. 2000), quoting *Neder*, 527 U.S. at 16. Betts-Gaston contested that element at trial, arguing that the mortgage applications were not materially false because the lenders did not care about the information the applications requested, such as the borrower's income.

Betts-Gaston sought to offer additional evidence on that point, which the district court excluded: an expert who would testify that the lenders' business model depended on generating large volumes of mortgage loans without regard for the borrower's ability to pay. On the government's motion, the district court barred the expert's proposed testimony as irrelevant and confusing to the jury. Defense counsel also sought to cross-examine several government witnesses on whether the lenders cared about or tried to verify loan application claims. The district court sustained government objections to such questions.

Betts-Gaston argues that those rulings were errors because the expert's testimony and the cross-examination questions were relevant to the materiality of the loan applications' false statements. We disagree. Betts-Gaston wanted to convince the jury that the lenders involved here routinely behaved unreasonably—that, as a matter of policy, they ignored information that a reasonable lender would consider, like the borrower's income. See *United States v. Spirk*, 503 F.3d 619, 621–22 (7th Cir. 2007) (describing, as an example of a materially false statement, obtaining a loan by exaggerating one's income). But whether a statement is material depends on its effect on "a reasonable person"—or, in this case, a reasonable lender. *Id.* at 621; *Neder*, 527 U.S. at 22 n.5 ("The Restatement instructs that a matter is material if … a reasonable man would attach importance to it[] … in determining his choice … ."), citing Restatement (Second) of Torts § 538 (Am. Law Inst. 1977); *United States v. Lindsey*, 850 F.3d 1009, 1015 (9th Cir. 2017) ("A false statement is material if it *objectively* had a tendency to influence, or was capable of influencing, a lender to approve a loan."). Whether a particular lender or group of lenders was in fact reasonable is irrelevant to that question. See *id.* (affirming exclusion of "evidence that [lenders] were willing to approve the loans regardless of the information included in the application forms"); cf. *United States v. Reynolds*, 189 F.3d 521, 525 (7th Cir. 1999) (evidence that bank would have approved defendant's loan regardless of judgments against him went to reliance, not materiality). We find no error.

D. *Sufficiency of Evidence on Count II*

Betts-Gaston moved after trial for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. She argued among other points that the evidence was insufficient to

show that she made materially false statements to either lend-
ers or homeowners. The district court denied the motion. We
review that denial *de novo*, and consider whether, taking the
evidence in the light most favorable to the government, a ra-
tional jury could have found Betts-Gaston guilty. *United States
v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010).

Betts-Gaston has narrowed her argument on appeal, fo-
cusing on only Count II, which charged her with wire fraud
in connection with the Howard property. Unlike the Raven-
gate and Trumbull homeowners, the Howard property owner
did not testify at trial. He had died in 2006. Betts-Gaston ar-
gues that as a result there is insufficient evidence that she
made false statements to him or to the relevant lender.

Her argument assumes that the jury must have considered
each iteration of her scheme to defraud in isolation from the
others. Not so. The jury might reasonably have credited evi-
dence that the Howard property transaction resembled the
Ravengate and Trumbull transactions. The same people, per-
forming the same roles in connection with the same company
during the same time period, found another homeowner
struggling with his mortgage. They arranged the same trans-
action—a sale to a straw buyer (the same straw buyer as in the
Ravengate transaction). The jury could reasonably have in-
ferred from that evidence that Betts-Gaston procured that
homeowner's cooperation by the same method testified to in
the Ravengate and Trumbull transactions: false statements.

Betts-Gaston's own testimony also indicated that she
made false statements to the Howard homeowner. In her tell-
ing, the homeowners her company served were not being de-
prived of all rights to their homes: they would become bene-

ficiaries of the trust that held the property. But she also testified that the Howard property was never put into the trust. She testified both that she told the homeowners that the sale proceeds would be put into escrow to pay the new mortgage, and that her company had never created escrow accounts. The jury could reasonably infer from those inconsistencies that Betts-Gaston lied to the Howard homeowner.

There was also evidence that Betts-Gaston lied to the Howard homeowner's sister, after her brother's death. The sister testified at trial. She explained that after her brother's death, she found documents indicating he had sold his home, and she called Betts-Gaston to ask about the sale proceeds. Betts-Gaston told her that the proceeds were in an escrow account, yet no escrow account ever existed. Betts-Gaston initially told her that the program's fee was $30,000, then that it was $41,000. Betts-Gaston also asked for an affidavit indicating that the homeowner's sister and mother were his heirs and that they wanted to receive the funds from the sale. The sister sent her those documents but never received the funds. The jury could reasonably infer from these inconsistencies that Betts-Gaston's control over the proceeds was obtained fraudulently.

E. *District Judge's Impartiality*

Betts-Gaston asserts that the district judge displayed hostility and contempt toward defense counsel throughout the trial, prejudicing the jury. Our review of the record convinces us that, while many of defense counsel's complaints are minor, there was a real and serious breakdown in the professional relationship between counsel and court. There were a few lapses where the court did not always meet the high

standard of professionalism judges do and should set for our-
selves, but we view those lapses as few and minor. Defense
counsel's outbursts, by contrast, were frequent and serious.

We do not reward defendants "for success in baiting the
judge," and we "allow reasonable latitude for normal human
sensitivity" in responding to such provocation. *Dellinger*, 472
F.2d at 386; *United States v. Beaty*, 722 F.2d 1090, 1094 (3d Cir.
1983) ("We … reject any suggestion that defense counsel may
inject reversible error into a trial by baiting the trial judge.");
*United States v. Weiss*, 491 F.2d 460, 468 (2d Cir. 1974) ("Judges,
while expected to possess more than the average amount of
self-restraint, are still only human."). As the Supreme Court
has explained, bias or partiality is not shown by "expressions
of impatience, dissatisfaction, annoyance, and even anger,
that are within the bounds of what imperfect men and
women, even after having been confirmed as federal judges,
sometimes display." *Liteky v. United States*, 510 U.S. 540, 555–
56 (1994), quoted in *United States v. Robbins*, 197 F.3d 829, 848
(7th Cir. 1999) (finding that visible expression of impatience
by author of this opinion did not deny defendants a fair trial).
With those principles in mind, we find that the district judge's
conduct did not deny defendant a fair trial.

Defense counsel's minor complaints include that the
judge: occasionally left the bench rather than immediately ad-
dressing her arguments; had her read a rule during argument
on a motion; forbade her paralegal to sit at the counsel table;
instructed her to display documents for the jury; told her to
obey prior rulings without explaining the rulings; expressed
frustration with how long the case had been pending; denied
requests for sidebars; told counsel not to thank him after his

rulings; questioned some witnesses himself; admitted documents before checking to see if counsel had objections; ended defense counsel's re-cross of one witness early; instructed the jury to disregard some of defense counsel's questions; proposed an additional jury instruction; did not let defense counsel show documents to government witnesses; and had the defendant read a document during her testimony.

Some of this conduct reflects preferences common among trial judges, such as the reluctance to use sidebar conferences, the requests to show the jury documents, and the dislike of long-pending cases and of being thanked for rulings. Some was an appropriate exercise of the judge's power as "the governor of the trial." *Quercia v. United States*, 289 U.S. 466, 469 (1933). For example, defense counsel cites two instances in which the court *sua sponte* instructed the jury to disregard her question. On the first occasion, the question called for speculation. On the second, the court found that counsel's rephrased question did not avoid a just-sustained objection. Neither instruction was inappropriate. Nor was the court's decision to end defense counsel's re-cross-examination of a witness since she was covering at length ground she had already covered during cross-examination. Compare Trial Tr. 561 and 569 with 575–76.

Betts-Gaston also complains that the court's questions, especially of the defendant, "highlight[ed] facts … to show" her guilt. We do not see, and the defense does not explain, how the district court's questions were incriminating. The judge clarified, for example, the size of Betts-Gaston's law office, who was present during one conversation, and which mortgage Betts-Gaston was testifying about.

We do not necessarily agree with all of the district court's decisions, some of which are puzzling. Barring a paralegal from counsel table created unnecessary inconvenience. By contrast, government case agents are routinely allowed to sit at counsel table to assist prosecutors. The court also did not find time, even at a lunch break or after the jury had been dismissed for the day, to explain its rulings and to permit counsel to make a record regarding them. The court also spoke as if documents not in evidence cannot be shown to witnesses, which is not correct. Impeachment, refreshing recollection, and authentication often require showing witnesses documents not in evidence. The reasons for these choices are not evident to us from the record, but these incidents could not have "giv[en] the jury an impression that the court believes the defendant is guilty." *United States v. Fry*, 304 F.2d 296, 298 (7th Cir. 1962).

These incidents also did not justify defense counsel's inappropriate outbursts. She got off on the wrong foot even before voir dire began, telling the judge his questions as she argued a motion were "exceptionally rude" and "interrupting." (Questions from a judge who has prepared by reading briefs should not be surprising. They provide a means to focus argument on the matters the judge deems most pertinent.) Counsel's arguments quickly became sarcastic to the point of hyperbole. She characterized the ruling on materiality evidence as "I can't utter the words 'subprime mortgage,'" adding "I don't believe you understand or know what the Court's order is. This Court is simply trying to obfuscate and make it very difficult for me to do my job." On another occasion—this time in front of the jury—she said of a sustained objection, "[i]s this an opportunity for [the witness] to continue to lie from the witness stand?" She accused the judge, in front of the

jury, of "advocating for the government now," "doing recross for the government," "violating my client's Sixth Amendment rights," "abdicating your job as a judge" because he did not "like the testimony coming into the record," and "attempt[ing] to influence the jury during these proceedings in an inappropriate manner." She asked if "the Court would like to take off its robe and come down here and do the government's job for it." In her closing argument, she said that "there are members around here that don't want you to be held to" the standard of proof beyond a reasonable doubt while gesturing, in the court's words, "to all involved in this trial." These inappropriate comments were well outside the bounds of professional conduct and zealous advocacy.

In the face of these provocations, which could easily have been deemed contemptuous, the judge did not show infinite patience. Several times, he extended conflicts with counsel when, at least from the cool remove of an appellate court, it seems it might have been better to let the issue drop until the jury left. Once he made a facial expression, reacting to the defendant's testimony. These responses fall well within the "reasonable latitude for normal human sensitivity" permitted "in judging whether responses to provocation … are excessive." *Dellinger*, 472 F.2d at 386; see also *Liteky*, 510 U.S. at 555–56; *Robbins*, 197 F.3d at 848.

The judge's responses differ in both kind and degree from judicial conduct that we have found required a new trial. In those unusual cases where we have found that a judge's conduct "destroy[ed] the required atmosphere of impartiality," the inappropriate behavior was both pervasive and directed toward the defendant. *Fry*, 304 F.2d at 298. In *Fry*, for example, the court asked 1,210 questions during a seven-day trial, some

of which "tended to ridicule the defendant and his wit-
nesses." *Id.* In the Chicago Seven case, the court made at least
150 comments in front of the jury "implying … that defense
counsel was inept, bumptious, or untrustworthy, or that his
case lacked merit," and "denigrating" the defense's theories.
*Dellinger*, 472 F.2d at 387–88 & n.83; see also *Beaty*, 722 F.2d at
1095 (defendant deprived of fair trial by court's prolonged
cross-examinations of three of four defense witnesses); *United
States v. Edwardo-Franco*, 885 F.2d 1002, 1005–06 (2d Cir. 1989)
(court's disparaging comments about Colombians at sentenc-
ing required re-sentencing of Colombian defendants); cf.
*United States v. Edmond*, 52 F.3d 1080, 1102 (D.C. Cir. 1995)
(even if court's few "perhaps gratuitous" comments were
prejudicial, their impact was minimal in a lengthy trial).

The court's comments in this case were few and (with the
exception of the facial expression, which the jury was imme-
diately instructed to ignore) not directed against the defend-
ant. The jury may have inferred (correctly) that the court be-
lieved defense counsel was behaving inappropriately. She
was. The jury had no reason to infer "that the court believe[d]
the defendant guilty." *Fry*, 304 F.2d at 298.

In some cases we have granted new trials even when there
was only one instance of judicial misbehavior, and even when
the misbehavior was not directed at the defendant. In *Walberg
v. Israel*, 766 F.2d 1071, 1074 (7th Cir. 1985), for example, the
judge's misconduct deprived the defendant of counsel's assis-
tance, even though he "did not misbehave during the trial"
and directed his animus against the defendant's lawyer. In
*United States v. Spears*, 558 F.2d 1296, 1298 (7th Cir. 1977), one
outburst directed against defense counsel "so discredited

[counsel] in the eyes of the jury that he could not have re-mained an effective spokesman for his client." But those cases involved prejudice not present here. In *Walberg*, the judge threatened not to approve court-appointed counsel's fees (and, implicitly, not to appoint him again) if he defended his client zealously, thereby creating a conflict of interest. 766 F.2d at 1074. In *Spears*, the court all but said the jury should not trust defense counsel. 558 F.2d at 1298. Nothing comparable happened during Betts-Gaston's trial. This was a fair trial. See *Edwardo-Franco*, 885 F.2d at 1006 ("A party does not demonstrate judicial bias simply by showing that a majority of the trial judge's rulings were against him and that there were occasional flare-ups between his attorney and the court."). We thus find no reversible errors affecting defendant's convictions.

## III. *Sentencing Challenges*

Betts-Gaston challenges her sentence on three grounds, arguing that: (A) the district judge should have granted her motion to disqualify him before sentencing; (B) the loss amount used in determining the sentencing guideline range was calculated incorrectly; and (C) no evidence supported enhancement of her sentence for obstruction of justice.

### A.  *Motion to Disqualify*

The day before Betts-Gaston's sentencing hearing was scheduled, her counsel filed a motion to disqualify the trial judge. The judge denied the motion, and Betts-Gaston argues that this was error.

Betts-Gaston relies on two statutes: 28 U.S.C. § 144, which requires that a new judge be assigned if a party "files a timely

and sufficient affidavit that the [original] judge … has a personal bias or prejudice" against her, and 28 U.S.C. § 455(a) & (b)(1), which requires that judges disqualify themselves when their "impartiality might reasonably be questioned" and when they have "a personal bias or prejudice concerning a party."

We reject the § 455 argument. The question under § 455 is whether a reasonable person, knowing all the circumstances, "would harbor doubts about the judge's impartiality." *Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1165 (5th Cir. 1982). For the reasons explained in the previous section, the judge's behavior when taken in context reflected understandable frustration, not "undeserved" or "excessive" prejudice. *Liteky*, 510 U.S. at 550.

We also reject the § 144 argument. The statute provides:

> Whenever a party to any proceeding in a district judge makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It

> shall be accompanied by a certificate of counsel
> of record stating that it is made in good faith.

28 U.S.C. § 144.

Under § 144, recusal is mandatory if the moving papers are sufficient. E.g., *United States v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993); *United States v. Barnes*, 909 F.2d 1059, 1071–72 (7th Cir. 1990). That makes the statute a powerful tool that could easily be abused, so its requirements are enforced strictly. *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 718 (7th Cir. 2004); *Sykes*, 7 F.3d at 1339; *Barnes*, 909 F.2d at 1072.

The district court denied recusal under § 144 for several reasons. First, there was no affidavit from Betts-Gaston herself, the "party" who must file an affidavit under the statute. That reason for denial was correct. We and other circuits have held that an affidavit from an attorney alleging bias is not sufficient. *U.S. ex rel. Wilson v. Coughlin*, 472 F.2d 100, 104 (7th Cir. 1973) (Stevens, J.); see also *Roberts v. Bailar*, 625 F.2d 125, 128 (6th Cir. 1980); *Giebe v. Pence*, 431 F.2d 942 (9th Cir. 1970).

Second, the statute requires a certificate from counsel of record that the affidavit is filed in good faith. There is no such certificate here. Counsel filed her own affidavit, which is not sufficient, and obviously could not certify that a non-existent affidavit from her client was filed in good faith. See *Mitchell v. United States*, 126 F.2d 550, 552 (10th Cir. 1942) (requirement for certificate by counsel is essential safeguard to prevent abuse of § 144); *Robinson v. Gregory*, 929 F. Supp. 334, 337–38 (S.D. Ind. 1996) (pro se party could not obtain recusal under § 144 because he could not comply with strict requirement for certificate of good faith by counsel); cf. *United States v. Boyd*, 208 F.3d 638, 645 (7th Cir. 2000) (suggesting that where pro se

criminal defendant sought recusal under § 144, district court should have appointed lawyer for limited purpose of deciding whether to file certificate), vacated on other grounds, 531 U.S. 1135 (2001).

Third, the judge found that the motion was not timely, coming on the eve of sentencing. An affidavit is timely if it is filed promptly after the movant learns of the basis for disqualification. *Sykes*, 7 F.3d at 1339, quoting *Barnes*, 909 F.2d at 1071. The two affidavits defense counsel filed address events at trial, four months before the filing. Those allegations were not timely.

Defense counsel realized this and explained in her affidavit that she first concluded the judge's bias was personal (though toward her, when bias toward her client is the issue under § 144, *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1398 (8th Cir. 1983)) when she read his order on her motion for a new trial, issued just eleven days before she moved for recusal. The portions of the order she discusses are strongly worded: they call her arguments frivolous, obfuscating, and "red herrings." But it is appropriate for judges to have opinions, even strong opinions, about the merits of arguments presented to them. That is their job. Such opinions do not show personal bias unless they "display clear inability to render fair judgment." *Liteky*, 510 U.S. at 551. Since defense counsel does not allege facts adequate to show that the order displayed personal bias, her tardiness is not excused by the theory that the post-trial order alerted her to a personal bias. The district judge did not err by finding that counsel failed to show good cause for the late filing of the § 144 motion or by relying on the other grounds to deny the motion.

B.  *Loss Amount Calculation*

In calculating Betts-Gaston's sentencing guideline range, the district court found that the actual and intended losses from her fraud were greater than $550,000 and adjusted her offense level accordingly. See U.S.S.G. § 2B1.1(b)(1)(H). The court arrived at that loss amount by adding up: (1) the home-owner equity extracted from each sale, and (2) the difference between the loans taken out on each home and that home's value, as measured either by a later sale or by the Cook County Assessor's Office. The Ravengate, Trumbull, Howard, and Hermosa properties were all included in the calculation.

Betts-Gaston raises three objections to that calculation: first that there is no evidence that her scheme involved the Hermosa property; second that her scheme did not cause any losses to the lenders; and finally that she provided legitimate services to the homeowners, the value of which should be subtracted from the loss amount.

1.  *The Hermosa Property*

The Hermosa property was not part of the trial but was an issue at sentencing. The presentence report included the Hermosa transaction as relevant conduct. The government's version of the offense explained the details, citing county records and a lawsuit against Betts-Gaston regarding the property. Betts-Gaston argues that there was no evidence that the Hermosa property was involved in the scheme.

Betts-Gaston's argument assumes that the district court could not rely on the presentence report as support for its conclusions. That assumption is incorrect: "district courts may rely on information contained in a PSR so long as it is well-

supported and appears reliable." *United States v. Moreno-Pa-dilla*, 602 F.3d 802, 808 (7th Cir. 2010) (citations omitted); see also *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995) ("Provided that the facts contained in a PSR 'bear sufficient indicia of reliability to support their probable accuracy,' the district court may adopt them 'as support for its findings and conclusions.'"), quoting *United States v. Salinas*, 62 F.3d 855, 859 (7th Cir. 1995).

"Generally, where a court relies on a PSR in sentencing, it is the defendant's task to show the trial judge that the facts contained in the PSR are inaccurate." *United States v. Mustread*, 42 F.3d 1097, 1101–02 (7th Cir. 1994). At least where there is an apparently reliable basis for information in a presentence report, "'bare denial'" is not enough. The defendant must produce "some evidence" calling the presentence report into question, unless the report contains only a "'naked or unsupported charge.'" *Id.* at 1102, quoting *United States v. Isirov*, 986 F.2d 183, 186 n.1 (7th Cir. 1993). This portion of this presentence report was supported by public property and litigation records. Betts-Gaston has not offered any evidence undermining those claims. The district court did not err in adopting the findings in the presentence report on the Hermosa property.

### 2.  *Lenders' Losses*

Betts-Gaston next claims that the government did not show that the lenders who provided the mortgage loans to her straw buyers suffered losses. Those lenders were, she contends, playing "hot potato" with those loans—reselling them as fast as possible for their full value. She says each lender involved here succeeded in reselling each fraudulently obtained loan and so never lost money.

The lenders' conduct might have made them inappropriate recipients of restitution. See *United States v. Litos*, 847 F.3d 906, 909 (7th Cir. 2017) (restitution not appropriately awarded to bank that facilitated defendants' "massive fraud"). But it is not relevant to loss amount. For guideline purposes, the government did not need to show just who suffered losses. The Sentencing Guidelines define "loss" as the greater of actual or intended loss. U.S.S.G. § 2B1.1 cmt. (3)(A). "Intended loss," in turn, means "pecuniary harm that the defendant purposely sought to inflict." § 2B1.1 cmt. (3)(A)(ii). Our cases have explained that intended loss is "the amount that the defendant placed at risk." *United States v. Lauer*, 148 F.3d 766, 768 (7th Cir. 1998). Betts-Gaston's scheme induced lenders to make mortgage-backed loans that were much riskier than their lenders realized because the borrowers were not as creditworthy as reported. Whoever held those mortgages was exposed to that risk.

Nothing in the Guidelines text requires the government or the court to identify specifically who was at risk. Cf. § 2B1.1 cmt. (3)(C)(iv) (explaining that losses can be calculated by multiplying average losses and the "approximate number of victims"). Nor does the relevant case law. In *United States v. Engelmann*, 720 F.3d 1005, 1014 (8th Cir. 2013), for example, the defendant pointed out that the mortgages he fraudulently obtained were securitized, making it "more difficult to allocate losses among individual banks or investors." The court nonetheless affirmed a loss calculation that reasonably estimated "total loss." *Id.* In this case, the district court adopted a method that also reasonably estimated losses, and we affirm the resulting calculation. See *United States v. Radziszewski*, 474 F.3d 480, 487 (7th Cir. 2007) (approving, in a mortgage fraud

case, an intended loss amount calculated by subtracting the property's sale value from the loan amount).

### 3.  *Homeowner Losses and "Legitimate Services"*

Betts-Gaston's final argument on loss amount is that the losses to the homeowners should have been calculated net of the amounts paid toward the properties' new mortgages, and of the value the homeowners received from being allowed to stay in their homes. Those were legitimate services, she argues, and cannot be included in the loss amount. See *United States v. Swanson*, 483 F.3d 509, 513 (7th Cir. 2007).

Our review of "legitimate services" case law in this and other circuits suggests that the dividing line between legitimate and illegitimate services has not been clearly defined. But a common thread in those cases is that services are legitimate when the victim agreed to pay for them. In *Swanson*, for example, the alleged legitimate services were payments of closing costs for an acquisition the victim gave the defendant funds to make. *Id.* And in *United States v. Camacho*, 348 F.3d 696, 699 (8th Cir. 2003), the legitimate services were computer consulting work the victim had employed the defendant to perform. Similarly, in *United States v. Vivit*, 214 F.3d 908, 915 (7th Cir. 2000), the defendant billed for a fraudulently inflated quantity of medical services. The loss amount was calculated net of the medical services he in fact provided. By contrast, in *United States v. Crosgrove*, 637 F.3d 646, 665–66 (6th Cir. 2011), the loss caused by defendant's fraudulent sale of insurance coverage was not calculated net of the "newsletter, gifts for clients, and … referral service" he in fact provided. The victims were sold insurance coverage and would not have paid anything "had they known the coverage was fraudulent." *Id.* at 666.

Betts-Gaston's scheme did not function by exaggerating the value of the services provided to its victims or by charging them for more services than were provided. It functioned, like the *Crosgrove* scheme, by selling a service it did not in fact provide. It was entirely fraudulent. Under those circumstances, the district court did not err in refusing to consider some portion of the defendant's services "legitimate."

### C. *Obstruction of Justice*

Finally, the district court adjusted Betts-Gaston's guideline offense level because it found that she obstructed justice by testifying falsely at trial. See U.S.S.G. § 3C1.1. Betts-Gaston's father was the straw buyer for the Trumbull property. His mortgage application stated falsely that he was buying the property as a second home. Betts-Gaston testified at trial that she did not know the application said that, and that when she found out at the transaction's closing, she explained to her father that he would have to stay at the property occasionally. The district court found that testimony to be false. Betts-Gaston argues that no evidence supports that finding. We review such factual findings for clear error, affirming unless we are left with a definite and firm conviction that a mistake has been committed. *United States v. Davis*, 442 F.3d 1003, 1008–09 (7th Cir. 2006), quoting *United States v. Lanzotti*, 205 F.3d 951, 956 (7th Cir. 2000).

The district court's determination was not mistaken for two reasons: Betts-Gaston's narrative was implausible in its own right, and Ross's testimony contradicted her. To believe Betts-Gaston's version of the story, the court would have had to believe that, on learning for the first time that the application erroneously indicated the purchase was for a second home, Betts-Gaston would not have tried to fix the error. It

would have had to accept that she thought it made sense to ask her father to move from the suburbs to Chicago's south side to reside occasionally with a woman he did not know, presumably leaving his mother (who lived with him) alone. And the court would have had to believe that her father agreed to that after one conversation at the closing. The court did not clearly err in disbelieving that testimony.

Nor did the court err in crediting Ross's testimony. She described Betts-Gaston as actively involved with her father's loan application, acting as a go-between to adjust his reported income and the purpose of the purchase until he qualified for the loan. In Ross's account, Betts-Gaston proposed reporting that the property would be her father's primary residence, but Ross refused to use such a blatant falsehood. Betts-Gaston then said to say it would be his secondary residence, and Ross agreed to that. That testimony supports the district court's application of the obstruction of justice enhancement.

The judgment of the district court is AFFIRMED.